HERMANN v. THOMAS et al.

(Court of Civil Appeals of Texas. Galveston. Nov. 29, 1911. Rehearing Denied Dec. 21, 1911.)

1. ADVERSE POSSESSION (§ 104*) — PRESUMPTIONS—GRANT.

A legal presumption of a grant may be based upon long-continued possession and use; such presumption being a rule of law adopted upon principles of public policy for the purpose of quieting title.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 595–602; Dec. Dig. § 104.*]

2. ADVERSE POSSESSION (§ 104*)—PRESUMPTION OF GRANT.

Acquiescence of A. in B.'s possession under a claim of title from C., the common source of title, does not justify or support a presumption of a conveyance from A. to B.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 595–602; Dec. Dig. § 104.*]

3. TRIAL (§ 252*) — INSTRUCTIONS — APPLICABILITY TO ISSUES.

Where the evidence in trespass to try title does not raise the issue of a presumption that plaintiff's grantors had ever executed a deed or release to the land in controversy to defendants' predecessors, an instruction authorizing the jury to conclude that such a deed or release had been executed is erroneous as being inapplicable to the issues.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 596–612; Dec. Dig. § 252.*]

4. VENDOR AND PURCHASER (§ 244*)—BONA FIDE PURCHASE—EVIDENCE.

Evidence, in an action of trespass to try title, held sufficient to authorize a finding that a conveyance from a common grantor to defendants' predecessors was in pursuance of a sale or contract made by such grantor prior to his conveyance to plaintiff's grantors, and that at the time he purchased plaintiff's grantor had knowledge of such sale or contract of sale.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 609–611; Dec. Dig. § 244.*]

5. DEEDS (§ 114*)—INDEFINITE DESCRIPTION—SELECTION OF LAND FROM LARGER TRACT.

Where defendant establishes a right to the recovery of a certain number of acres of land conveyed to his grantors with the right to select the tract from a larger tract, he will be confin-

ed to the land occupied and claimed by his grantors.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. § 329; Dec. Dig. § 114.*]

Appeal from District Court, Harris County; Charles E. Ashe, Judge.

Trespass to try title by George H. Hermann against Wm. W. Thomas and others, with a plea in reconvention asking a recovery of title and possession and for the relocation of a boundary line. Judgment for defendants, and plaintiff appeals. Reversed and remanded.

J. W. Lockett, for appellant. S. H. Brashear, for appellees.

PLEASANTS, C. J. This is an action of trespass to try title, brought by appellant against the appellees, Wm. W. Thomas and others. The land involved in the suit is a part of the John Brown Jones one-third league survey in Harris county and is described in the petition as follows: "Beginning at the northeast corner of said John Brown Jones one-third league a stake at the mouth of a slough, a lake facing trees marked X; thence south along the east line of John Brown Jones one-third league, 651 varas, to stake; thence west, 675.1 varas, to stake in the east line of old Humble tract a sapling pine marked ―― stands for corner from which a pine stump bears S. 10 deg. E. 10 feet distant, and a sapling bears N. 25 deg. W. 10 feet distant; thence north along an old blazed line, 701 varas, to northeast corner of old Humble 300-acre purchase, now northeast corner of George H. Hermann 150-acre tract, a pine stake in the center of a ravine from which a cypress tree marked X bears N. 15 deg. W. 8 feet distant; thence west following a blazed line 342½ varas to stake in ravine facing tree marked X, being the southeast corner of Matthews 24-acre tract out of the northwest corner of said John Brown Jones one-third league; thence north along the east boundary line of same, 193 varas, to its northeast corner, a stake in the south bank of the San Jacinto river; thence down said river with its meanders to the place of beginning."

The defendants' answer contains plea of not guilty, pleas of limitation of five and ten years, and a plea in reconvention in which they allege that they own the land in fee simple, plead title by limitation of five and ten years, and pray for recovery of title and possession. They further allege that the south line of the land is located much further south than the line claimed by plaintiff, who owns the land immediately south of that in controversy, and they pray that the location of said line be established as claimed by them. The trial in the court below resulted in a verdict and judgment in favor of defendants, that plaintiff take nothing by his suit, and fixing the boundaries of the land as claimed by defendants.

The evidence shows that the one-third league survey, of which the land in controversy is a part, was patented to John Brown Jones on February 10, 1846. This survey is in form a parallelogram fronting on the San Jacinto river, which forms its northern boundary. On August 26, 1846, Jones conveyed to Joseph Dunman 292 acres, the west one-third of the survey, the line dividing the survey and segregating the 292 acres to run north and south and parallel with the west line of the survey. By deed dated August 6, 1855, Jones conveyed to Sarah Goodman all of the survey then unsold, being 984 acres more or less. On May 18, 1858, Sarah Goodman and husband conveyed to Joseph Dunman a tract of 279½ acres adjoining the 292-acre tract previously conveyed to him by Jones. This 279½-acre tract began at the southeast corner of the 292-acre tract on the south line of the Jones survey. From this corner the lines of said tract ran north 5,260 varas; thence east 300 varas; thence south 5,260 varas; and thence west 300 varas to the place of beginning. On the same day, May 18, 1858, Sarah Goodman and husband conveyed to A. Bourgeois the following described tract of land: "Six hundred and two acres of land out of the third of a league originally granted to John Brown Jones, being the remainder of said third of a league unsold at this time, situated on the west prong of the San Jacinto river, and being the tract upon which the said party of the second part now resides, and for more particular identification reference is hereby made to the field notes of the survey." This deed was witnessed by J. B. Woodyard and F. H. Bond, and duly signed and acknowledged.

Adelarde Bourgeois died in 1860 or 1861. He left a wife and a number of children surviving him. Plaintiff has acquired by conveyances the interests of the widow and several of the children of Adelarde Bourgeois in the estate of said Adelarde; the interests so acquired being seven-ninths of the estate.

On April 11, 1860, Sarah Goodman by her deed of general warranty conveyed to J. B. Woodyard and Eliza Morgan the following described land: "100 acres of land out of the John B. Jones headright on the west fork of the San Jacinto river in said county, said 100 acres to be taken out of said tract wherever said parties of the second part may select, being part of the same premises conveyed to Sarah Goodman by deed from John B. Jones, dated August 6, 1853, and recorded in Book R, page 488." J. B. Woodyard conveyed to John and Mary Thornton by deed dated June 29, 1868, recorded in volume 6, p. 249, "the undivided half of 100 acres in

the John B. Jones headright, said 100 acres to be taken out of said tract wherever said parties of the second part may select, it being a part of said premises conveyed to Sarah Goodman by deed from John B. Jones, dated August 6, 1853."

By deed of date November 4, 1869, Mrs. E. J. Hogan (formerly Eliza Morgan) conveyed to Mrs. E. J. Humble the following described tract of land: "The undivided half of 100 acres of land out of the survey originally granted to John B. Jones, said 100 acres was purchased by Mrs. E. J. Hogan and J. B. Woodyard from Mrs. Sarah Goodman by deed dated April 11, 1860, and recorded in Harris County Records, Book W, p. 655, said deed allows said parties the privilege of taking said 100 acres where they may select, said 100 acres begins at a post oak stump with living branches growing near the ground from which a forked mulberry six inches diameter marked X north 65 east 10⅝ varas and a pine six inches diameter marked X bears N. 74 degrees W. 10 varas, all standing on the south bank of the San Jacinto river; thence south 230 varas to a stake on the north line of Joseph Dunman's survey; thence east 220 varas with Dunman's north line to a stake from which a pine 16 inches diameter marked V bears north 55 degrees east 4⅓ varas; thence south 437 varas with Dunman's east line to a stake; thence east 571 varas to a corner in a thicket of cane, vines and briars; thence north 651 varas to a corner on the south bank of the San Jacinto river, bearing tree a birch 20 inches diameter, a white oak 10 inches diameter and an ash 8 inches diameter all marked T facing the corner; thence up San Jacinto river with all of its meanders to the beginning."

On November 15, 1879, John and Mary Thornton by their deed of said date conveyed to Mrs. E. J. Humble an undivided 50 acres out of a 100-acre tract on the J. B. Jones headright. The description of the 100-acre tract contained in this deed is the same as that in the deed from Mrs. Hogan to Mrs. Humble above set out.

Defendants have acquired the title of Mrs. Humble to the land conveyed to her by these deeds.

Prior to and for several years after the execution of the deed from Sarah Goodman to J. B. Woodyard and Eliza Morgan, J. B. Woodyard lived on the land in controversy and operated a ferry across the San Jacinto river. He was there as early as 1859, and according to the testimony of several witnesses as early as 1855. He built a small house on the land and cultivated a few acres which he had inclosed near his house. He lived there and operated the ferry until 1864 or 1865. Eliza Morgan lived with him, presumably as his wife, and during their joint occupancy they claimed to own the land under purchase from Sarah Goodman. The place was generally known as the Woodyard place and the Woodyard ferry or crossing for a number of years. After Woodyard left the place it was occupied by a man named Roberts, who was there as a tenant of Woodyard. In the meantime it seems that Eliza Morgan had abandoned Woodyard and married Hogan, and she and her husband attempted to oust Roberts. This resulted in a difficulty in which Hogan was killed. Thornton, who, as before shown, purchased from Woodyard, then took possession of the place and operated the ferry for about two years. After the sale to Mrs. Humble by Thornton and wife and Mrs. Hogan, the ferry was operated by P. S. Humble, the husband of Mrs. E. J. Humble. He and his family lived on the place for several years. In addition to operating the ferry, he ran a small grocery store in a house built by him near the ferry. He also cultivated the small field which Woodyard had put in. After the death of Adelarde Bourgeois, which occurred in 1860 or 1861, his widow and children, all of whom became of age before Woodyard and Mrs. Hogan sold the place, lived for a number of years in the neighborhood of this land, and it is improbable that they were not aware of the claim asserted by Woodyard and Mrs. Hogan and their vendees. Neither the widow nor any of the children of Adelarde Bourgeois are shown to have ever paid taxes on the land or asserted any claim thereto. The only testimony showing any claim on the part of Adelarde Bourgeois is that of his son, J. D. Bourgeois, who is now claiming an interest in the land, and who says that in 1859 when Woodyard was running the ferry he needed some timbers with which to repair his ferryboat and he got his (witness') father, Adelarde Bourgeois, to go with him and select it; that they got the timber on the land in controversy near the ferry; that Woodyard asked his father what he intended to charge him for it, and his father replied that he would not charge him anything if he would let his (Bourgeois') children cross the ferry free; that his father then went home and told witness' mother that he had arranged for free passage for the children over the Woodyard ferry. The tax records of Harris county show that Adelarde Bourgeois rendered for taxes 604 acres of land in the J. B. Jones survey for the years 1858, 1859, and 1860. There has been payment of taxes and continuous active assertion of ownership by Mrs. Humble and those claiming under her down to and including the defendants.

Plaintiff did not know when he purchased the interests of the widow and heirs of Adelarde Bourgeois in the estate of said Bourgeois that the land in controversy belonged to said estate. He had always heard the land called the "Woodyard tract," and supposed up to a short time before this suit was filed that Woodyard had owned the land and that defendants had title thereto through Woodyard.

Upon this state of the pleadings and evidence the trial court gave the jury the following instructions:

"You are charged that the deed from T. J. and Sarah Goodman of date May 18, 1858, to Adelarde Bourgeois, conveyed the title to the land in controversy to the said Bourgeois, and you are instructed that plaintiff is entitled to recover the land sued for, unless you find for the defendants under the issue of a presumption of a deed or release to be hereinafter submitted to you in this charge.

"The defendants claim title by presumption of a deed in favor of those under whom they claim from the heirs or assigns of Adelarde Bourgeois for said land, and on this issue you are instructed as follows: It is not necessary that the defendants, Bailey and others, should produce a record title to the land in controversy; but you have a right to presume a deed or release from the heirs or assigns of the said Adelarde Bourgeois and in favor of the said defendants or those under whom they claim title in their chain of conveyance, so if you believe from the facts and circumstances in evidence, and from a fair consideration of all of the circumstances in the case (those which the jury may believe repel, as well as those which the jury may believe to favor, such presumption), that the circumstances are consistent with the inference or presumption that such deed or release was made, as claimed by the defendants, and that in view of all the circumstances it is more reasonable that such deed or release was made, than that it was not, then the jury are at liberty to presume and find that it was; and, if the jury deciding the issues in favor of the weight of the evidence upon points to be determined by them do so presume and find, they will let the verdict be for the defendants, on the issue of presumption of deed or release; but, if the jury do not so presume and find, they will let their verdict be in favor of the plaintiff on this issue."

The jury are charged that in considering the matter of a presumption of a deed or release they may consider all of the facts and circumstances which have been introduced bearing upon this matter, whether the same be before the land was selected and described in the deeds to Humble in 1869 or 1870 or after that time, and that in order to support the presumption it is necessary to presume a deed or release from the heirs or assigns of the said Adelarde Bourgeois since November 4, 1869.

In this connection, the jury are further charged that, in order to authorize the jury to presume or find the existence of a deed not produced, the facts and circumstances in evidence must be consistent with the execution of such deed, and that the presumption of such a deed cannot arise where all the circumstances are perfectly consistent with the fact that such deed was never executed. "You are not authorized under the evidence in this case to presume or find the execution of any deed or release from Adelarde Bourgeois' heirs or assigns made directly to the defendants herein, or either of them."

[1] Under appropriate assignments of error the plaintiff complains of that portion of the charge above quoted which submitted the issue of presumption of a deed, on the ground that the evidence is insufficient to raise the issue of a conveyance or release of the land in controversy by the heirs or assigns of Adelarde Bourgeois to J. B. Woodyard or Eliza Morgan or any of defendants' predecessors in title. The doctrine of presumption of a deed or of lawful origin of title arising from long-continued active assertion of ownership shown to have been acquiesced in by the apparent holder of the title is firmly established in our jurisprudence. The distinction between this doctrine and that of the conclusive legal presumption of a grant or deed based upon long-continued possession and use is well defined.

In the first case the presumption is an inference of fact which may be drawn from proof of circumstances which make it more probable that a deed was executed or title acquired by the possessor, or the person actively asserting ownership of the property for a number of years, than that such assertion of ownership was not founded upon a grant and had no lawful origin.

[2] The presumption in the latter case is an artificial, arbitrary rule of law adopted upon principles of public policy for the purpose of quieting titles and conserving the peace and security of society. This latter doctrine has no application in cases like the one presented by this record, and, in determining the question presented by the assignments complaining of the charge above set out, we must look to the evidence to find whether the circumstances proven are sufficient to authorize the conclusion that it is more probable that the heirs or assigns of Adelarde Bourgeois executed a deed or release to the land in controversy to defendants' predecessors in title than that no such deed or release was executed, and unless the evidence authorizes such conclusion the jury could not presume as a fact that such deed or release was executed. Taylor v. Watkins, 26 Tex. 690; Herndon v. Vick, 89 Tex. 471, 35 S. W. 141.

We do not think reasonable minds can differ in the conclusion that the evidence before set out does not justify the inference that such deed or release was executed. In the first place, none of the defendants' grantors ever claimed title under Bourgeois or his heirs or assigns; but, on the contrary, Woodyard and Eliza Morgan claimed under the deed from Sarah Goodman, and their possession and claim of title and the possession and assertion of title of their ven-

dees were referable to and under the Goodman deed.

The deeds from Mrs. Hogan and Woodyard under which Mrs. Humble acquired title refer to the deed from Mrs. Goodman as the source of title of the grantors, and Mrs. Humble's claim of title was presumably under same deed. There is nothing in the evidence to indicate that any subsequent holder of the Humble title ever claimed to have title to the land other than that acquired under Woodyard and Mrs. Hogan through Mrs. Humble.

Two of the Bourgeois heirs testified in this case and claimed that the land was conveyed to their father and was never conveyed to Woodyard or to any of defendants' predecessors in title, but was now owned by plaintiff and the heirs of Bourgeois who had not conveyed their interest to plaintiff.

To presume or infer the execution of a deed from these heirs to any of defendants' predecessors in title is to presume against all of the evidence and is inconsistent with the claim of title asserted by those under whom defendants claim.

We think it clear that the acquiescence of A. in B.'s possession under a claim of title from C. would not justify or support the presumption of a conveyance from A. to B. If there had been no conveyance to Woodyard and Mrs. Hogan, and no evidence that their claim of title was not under Bourgeois or his heirs, it might be that the evidence would be sufficient to support the presumption of a deed from or under Bourgeois; but upon the evidence in this record no such presumption can be sustained.

In the case of Walker v. Caradine, 78 Tex. 491, 15 S. W. 32, the court say: "The presumption of a grant which arises from the long-continued possession and use of real property is a presumption of fact and can only have controlling effect upon the title when all the circumstances in proof are consistent with the grant. It is not arbitrarily indulged in favor of long adverse possession merely, but should only be given effect when the circumstances in proof in the particular case are sufficient to induce the belief that a legal conveyance under which the possession has been taken and held has been in fact made."

In the case of Lumber Co. v. Pinckard, 4 Tex. Civ. App. 671, 23 S. W. 720, this court held that, when the evidence showed that the possession of land was claimed under a deed shown to have been a forgery, the issue of the presumption of a valid deed was not raised, notwithstanding the evidence of possession and claim would have supported such presumption if such claim had not been referable to the forged deed.

In Poland v. Porter, 44 Tex. Civ. App. 334, 98 S. W. 214, it is held in effect that when it is more consistent with the facts shown by the evidence to presume that the possession and assertion of claim was under deeds introduced in evidence but which did not show title, than to presume that such claim was under a lost deed which conveyed the title, the presumption of the existence of the lost deed cannot be indulged.

[3] We think these decisions require the holding that the evidence in this case does not raise the issue of a conveyance of the land in controversy by the heirs or assigns of Bourgeois to any of defendants' predecessors in title, and therefore the assignments complaining of the charge on the ground before stated must be sustained.

We cannot, however, agree with plaintiff in the contention that the trial court erred in not instructing the jury to return a verdict in his favor.

While the evidence does not raise the issue of presumption of a deed submitted to the jury by the charge of the court, it does raise the issue of a sale or contract of sale by Sarah Goodman and her husband to J. B. Woodyard and Eliza Morgan of the 100 acres described in the deed to them by Sarah Goodman before set out, made prior to the conveyance to Bourgeois of the 602 acres of land described in the deed to him, and known to said Bourgeois at the time he purchased. Such sale or the existence of such contract of sale and the knowledge thereof by Bourgeois at the time of his purchase are entirely consistent with the facts shown by the evidence and explains the apparent inconsistency in the description of the land in the deed to him by the Goodmans.

If, as a matter of fact, the Goodmans had prior to the execution of their deed to Bourgeois sold or contracted to sell 100 acres of the land on the Jones survey owned by them to Woodyard and Mrs. Morgan, and Bourgeois knew of this sale or contract of sale, the deed to him from the Goodmans was not intended to and did not pass title to him to this 100 acres because it was not "unsold" at the time said deed was executed.

The evidence authorizes the finding that Woodyard had built a house upon this land and was living there with Mrs. Morgan, operating a ferry and cultivating a small portion of the land at the time and for several years prior to the conveyance to Bourgeois. Let us suppose that when Bourgeois purchased the land from the Goodmans and took the deed from them they said to him: "We have sold or have agreed to sell and convey to Woodyard and Mrs. Morgan 100 acres of our land on the Jones survey to be selected by them. According to our deeds after deducting this 100 acres we have a balance of 602 acres, and we will sell and convey to you this 602 acres." If Bourgeois purchased the land and the deed was executed by the Goodmans and accepted by him with this understanding, we think it clear that no title to the 100 acres passed to him by said deed. The circumstances shown by the evidence are amply sufficient to sustain the finding that such sale or contract of sale

had been made by the Goodmans, and that Bourgeois purchased the land with knowledge of the existence of such sale and the right of Woodyard and Mrs. Morgan to 100 acres out of the Goodmans' land on the Jones survey. The deed recites that the land conveyed is 602 acres, which is within 2 acres of the amount that the Goodmans would have owned in the survey after deducting 100 acres if the land contained the exact number of acres called for in the deeds under which they claimed. After his purchase Bourgeois in rendering his land for taxes rendered it as 604 acres, which was the exact number of acres conveyed to him after deducting the 100 acres if the number of acres stated in the deed to Goodman was correct, thus indicating that, while his deed only called for 602 acres, he understood that it conveyed to him all of the land then owned by the Goodmans on the Jones survey except the 100 acres sold or contracted to be sold to Woodyard and Mrs. Morgan, and according to the acreage called for in the deed to Goodman he (Bourgeois) owned 604 instead of 602 acres. We think this rendition by Bourgeois is very significant. The year that he purchased the land and each year thereafter up to the time of his death he rendered the land as 604 acres. This, as before stated, was the exact number of acres sold to him if Woodyard's 100 acres were not included and the acreage called for in the deed to Goodman was correct. The fact that he rendered his acreage when his deed called for only 602 acres indicates that he understood that he had bought all of the land except that previously sold, and according to the deeds to Goodman the amount sold him was 604 instead of 602 acres as recited in his deed. If he estimated the number of acres rendered for taxes by him in this way, it is apparent that he understood that the Woodyard 100 acres was not included in the deed to him; otherwise he would have rendered 704 acres instead of 604.

[4] These circumstances, taken in connection with the notorious and long-continued possession and claim of Woodyard and Mrs. Morgan and those claiming under them and the acquiescence of Bourgeois and his heirs in such claim, are sufficient to authorize the finding that the conveyance by Sarah Goodman, presumably after the death of her husband, to Woodyard and Mrs. Morgan of 100 acres of the land, was in pursuance of a sale or contract made by Mrs. Goodman and her husband prior to their conveyance to Bourgeois, and that Bourgeois had knowledge of such sale or contract of sale at the time he purchased, and said 100 acres was therefore not included in the deed to him.

If, upon another trial, the jury should find this state of facts to exist, they should find for the defendants for 100 acres of the land.

The deed from Sarah Goodman only conveyed 100 acres of land, and defendants can only recover that amount unless they can establish title by limitation or estoppel to a larger acreage.

[5] If their recovery be confined to 100 acres, that acreage must be taken out of the tract claimed by them, and they are not entitled to have it located upon any other portion of the land sold to Bourgeois.

These conclusions render a detailed discussion of the various assignments of error contained in plaintiff's brief unnecessary.

For the reason indicated, the judgment of the court below is reversed, and the cause remanded.

Reversed and remanded.