HERMANN v. THOMAS et al.   (No. 261.)

(Court of Civil Appeals of Texas. El Paso. April 9, 1914. On Rehearing, June 25, 1914.)

1. VENDOR AND PURCHASER (§ 244*)—BONA FIDE PURCHASER—EVIDENCE.

Evidence in trespass to try title *held* sufficient to authorize a finding that a conveyance from a common grantor to defendant's predecessors was in pursuance of a sale or contract by such grantor prior to his conveyance to plaintiff's grantors, and that plaintiff's grantor, when he purchased, had knowledge of such sale or contract of sale.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 609–611; Dec. Dig. § 244.*]

On Rehearing.

2. DEEDS (§ 111*)—INDEFINITE DESCRIPTION —SELECTION FROM LARGER TRACT.

The deed of a grantee of 100 acres of land, to be selected out of a larger tract, undertaking to convey a particular part of a 100-acre tract, established that the selection had been previously made.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 309–315, 334, 335; Dec. Dig. § 111.*]

3. BOUNDARIES (§ 3*)—DESCRIPTION — RELATIVE IMPORTANCE OF CONFLICTING ELEMENTS.

When the unmarked line of an adjacent survey is called for, and where, from the other calls of such survey, the position of such unmarked line can be ascertained with accuracy, and there is no evidence as to how the survey

was actually made, there is no reason why the survey line should not be given the dignity of an artificial object and prevail over course and distance; but a call for the line of an adjoining survey should not prevail over a call for distance, unless such line itself can be located with reasonable certainty, and, if it cannot be so located, it should be disregarded, and the terminus fixed according to the call for distance, so that where the true location of a south line of a league survey was uncertain, and the north line and northeastern corner of a conveyance of part thereof were equally uncertain, and could be found only by running the course and distance, there was such uncertainty that, in determining the location of the south line, the call for the north line and northeast corner will be disregarded, and the survey reconstructed by the calls for course and distance.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 3–41; Dec. Dig. § 3.*]

4. TRESPASS TO TRY TITLE (§ 41*) — SELECTION FROM LARGER TRACT—CONSENT—SUFFICIENCY OF EVIDENCE.

Evidence in trespass to try title *held* insufficient to show acquiescence on the part of a prior grantee to the selection by a subsequent grantee, whose deed was based on a prior contract, of more than 100 acres out of a larger tract.

[Ed. Note.—For other cases, see Trespass to Try Title, Cent. Dig. §§ 62, 63; Dec. Dig. § 41.*]

Appeal from District Court, Harris County; Chas. E. Ashe, Judge.

Trespass to try title by George H. Hermann against William W. Thomas and others. Judgment for plaintiff in part, and for defendants in part, and plaintiff appeals. Reversed and remanded on rehearing.

See, also, 141 S. W. 574, 143 S. W. 195.

J. W. Lockett, of Houston, for appellant. S. H. Brashear, of Houston, for appellees.

HIGGINS, J. This is an action in the ordinary form of trespass to try title brought by Hermann against Thomas and others to recover a certain parcel of land, part of one-third of a league in Harris county, granted to John Brown Jones; the land sued for being described in plaintiff's petition as follows:

"Beginning at the northeast corner of said John Brown Jones 1/3 league, a stake at the mouth of a slough, a lake, facing trees mkd. X; thence south along the east line of John Brown Jones 1/3 league 775 varas to stake; thence west 675.1 vrs. to stake in the east line of old Humble tract, a sapling pine mkd. ——— stands for cor. from which a pine stump bears S. 10° E. 10 ft. distant, and a sapling bears N. 25° W. 10 ft. distant; thence north along an old blazed line 701 vrs. to N. E. cor, of old Humble 300-acre purchase, now N. E. cor. of George H. Hermann or Bissonet 150-acre tract, a pine stake in the center of a ravine from which a cypress tree mkd. X bears N. 15° W. 8 ft. dist.; thence west following a blazed line 342½ vrs. to stake in ravine facing tree mkd. X, being the S. E. corner of Matthews 24-acre tract out of the N. W. cor. of said John Brown Jones 1/3 league; thence north along the east boundary line of same 193 vrs. to its N. E. cor., a stake in the south bank of the San Jacinto river; thence down said river with its meanders to the place of beginning."

The Jones' one-third league is in form a parallelogram, fronting on the San Jacinto river, which forms its northern boundary, and is described as follows:

"Beginning at a sycamore on the south bank of the said river, marked J. B., four pointing trees blazed; thence south 5,895 varas to a stake and mound in the prairie; thence east 1,444 varas to a blackjack marked X in a black jack grove pointing trees blazed; thence north 5,695 varas to a magnolia marked J. B. on the bank of the San Jacinto river at the mouth of a slough emptying into said river, pointing trees marked by blazing; thence up said river with its meanders to the place of beginning."

The grant was patented February 10, 1846. On August 28, 1846, Jones conveyed to Joseph Dunman 492 acres, the west one-third of his grant. No part of this land is in controversy herein. By deed dated August 6, 1853, Jones conveyed to Sarah Goodman all of his said one-third league then unsold, being 984 acres, more or less.

By deed dated May 18, 1858, Sarah Goodman and husband, T. J. Goodman, conveyed to Joseph Dunman 279½ acres adjoining the 492-acre tract previously conveyed to Dunman. This 279½-acre tract began in south line of the Jones survey at the southeast corner of the 492-acre tract, and from this corner the lines ran north 5,260 varas; thence east 300 varas to light wood knot witness trees marked V; thence south 5,260 varas; thence west 300 varas to beginning.

In consideration of $602, and by deed of same date, May 18, 1858, Sarah Goodman and husband conveyed to Adelard Bourgeois the following described land:

"602 acres of land out of the third of a league originally granted to John Brown Jones, being the remainder of said third of a league unsold at this time situated on the west prong of the San Jacinto river, and being the tract upon which the said party of the second part now resides, for more particular identification reference is hereby made to the field notes of the survey."

The two deeds last mentioned were witnessed by J. B. Woodyard.

Bourgeois died, leaving surviving wife and children, and Hermann acquired from them an undivided seven-ninths interest in said 602-acre tract.

By general warranty deed dated April 11, 1860, Sarah Goodman conveyed to J. B. Woodyard and Eliza Morgan the following premises:

"100 acres of land out of the John B. Jones headright on the west fork of the San Jacinto river in said county, said hundred acres to be taken out of said tract wherever said parties of the second part may select, being part of the same premises conveyed to said Sarah Goodman by deed from John B. Jones, dated August 6, 1853, and recorded Book R, page 488."

By general warranty deed dated November 4, 1869, E. J. Hogan (formerly Eliza Morgan) conveyed to Mrs. E. J. Humble land described as follows:

"The undivided half of one hundred acres of land out of a survey originally granted to John

B. Jones. Said one hundred acres was purchased by Mrs. E. J. Hogan and J. B. Woodyard from Mrs. Sarah Goodman by deed dated April 11th, 1860, and recorded in Harris County Record Book W, page 655. Said deed allows said parties the privilege of taking said one hundred acres 'where they may select.' Said one hundred acres begins at a post oak stump with living branches growing near the ground from which a forked mulberry 6 in. dia. mkd. X N. 65 deg. E. 10⅔ vs. & a pine 6 in. dia. mkd. X bears N. 74 deg. W. 10 vs. all standing on the south bank of the San Jacinto river; thence south 230 vrs. to a stake on the north line of Joseph Dunman's survey; thence east 220 vs. with Dunman's north line to a stake from which a pine 16 in. dia. mkd. V brs. N. 55 deg. E. 4⅓ vs.; thence south 437 vs. with Dunman's east line to a stake; thence east 571 vs. to a corner in a thicket of cane, vines and briars; thence north 651 vs. to a corner on the south bank of San Jacinto river, bearing trees, a birch 20 in. dia., a white oak 10 in. dia., and an ash 8 in. dia., all mkd. T, facing the corner; thence up San Jacinto with all its meanders to the beginning."

By general warranty deed dated June 29, 1868, J. B. Woodyard conveyed to John and Mary E. Thornton premises described as: ·

"The undivided half of 100 acres of land out of the John B. Jones headright on the west fork of the San Jacinto river in said county, said 100 acres to be taken out of the said tract wherever said parties of the second part may select; it being a part of said premises conveyed to Sarah Goodman by deed from Jno. B. Jones dated August 6th, 1853."

By general warranty deed dated November 15, 1870, the Thorntons conveyed to Mrs. E. J. Humble:

"50 acres of land; it being the undivided half of 100 acres of land out of the J. B. Jones headright on the west fork of the San Jacinto river in said county, state of Texas, field notes of a survey of 100 acres of land out of the north part of the J. B. Jones headright situated on the west prong of the San Jacinto river about 18 miles N. E. from the city of Houston, beginning at the N. W. corner of said 100 acres, a post oak stump with living branches growing on it from which a forked mulberry 6 in. diameter marked X bears north 65 deg. E. 10⅔ vs.; thence south 230 vs. to corner; thence E. 220 varas to a stake from which a pine 16 inches in diameter marked V bears north 55 deg. east 4⅓ vs., the same being the northeast corner of Joseph Dunmans; thence south 437 vrs. with Dunmans east line to a stake; thence east 571 vs. to a corner in a thicket of cane, vines and briars; thence north 651 vs. to San Jacinto river, bearing tree, a birch 20 inches in D, an ash 8 inches in D., and white oak 10 inches De., in all marked T; thence up the San Jacinto river with all its meanders to the place of beginning."

Defendants have acquired the title of Mrs. Humble to the land conveyed to her by their deeds.

The only deeds of record in Harris county from Sarah Goodman affecting the title in controversy are the three mentioned above.

The cause was tried before a jury and submitted upon special issues. The charge of the court and jury's answers to the issues submitted read as follows:

"Gentlemen of the jury, you are instructed as follows: ·

"Your verdict will be made up of answers to the special issues which will be hereafter submitted to you, which answers you will cause to be written on a separate sheet of paper, numbering the same to correspond with the questions submitted to you, and causing them collectively to be signed by your foreman.

"In order that you may understand the law governing the various questions to be answered by you, the court in connection with each issue presents to you the law pertinent thereto.

"There has been introduced in evidence a deed from T. J. and Sarah Goodman to Adelard Bourgeois, dated May 18, 1858, through which the plaintiff claims. There is also in evidence a deed from Sarah Goodman to J. B. Woodyard and Eliza Morgan dated April 11, 1860, and a deed from said Woodyard to Thornton dated June 29, 1868, and a deed from Thornton and wife to Mrs. E. J. Humble dated November 15, 1870, and another deed from Mrs. E. J. Hogan (formerly Morgan) to Mrs. E. J. Humble dated November 4, 1869, through which deeds the defendants claim. The defendants also invoke the presumption of a deed or a contract of sale from T. J. and Sarah Goodman to J. B. Woodyard and Eliza Morgan prior to May 18, 1858, and, upon this issue as a guide to you in answering the question or questions to be hereinafter asked of you, you are instructed that in some instances, if the facts and circumstances are sufficient, it is permissible for the jury to supply an omission or missing link in a chain of title by presuming that some deed or contract of sale other than those introduced in evidence had been executed.

"You are further charged that, in order to authorize the jury to presume or find the existence of a deed or contract of sale not produced, the facts and circumstances in evidence must be consistent with the execution of such a deed or contract of sale, and that the presumption of such deed or contract of sale cannot arise where all of the facts and circumstances in evidence are perfectly consistent with the fact that no such deed or contract of sale was ever executed.

"You are further instructed that, under the facts and circumstances in this case, you are not authorized to presume any deed or contract of sale which will be of any benefit to the defendants, unless and except you believe from the evidence that some deed or contract of sale not produced was made by T. J. and Sarah Goodman to J. B. Woodyard and Eliza Morgan prior to the 18th day of May, 1858, and that Adelard Bourgeois had knowledge or notice thereof when he purchased on the 18th of May, 1858.

"If you believe from a fair consideration of all of the facts and circumstances in the case— including any facts or circumstances which you believe repel the presumption, as well as those you believe may be in favor of the presumption —that T. J. and Sarah Goodman at some time prior to the 18th day of May, 1858, made a deed of conveyance or contract of sale to J. B. Woodyard and Eliza Morgan of 100 acres of land to be selected by the grantees, and that the facts and circumstances are consistent with the execution of such a deed of conveyance or contract of sale, and if from the evidence you believe it is more reasonably probable that such a deed or contract of sale was made than that it was not made, then you are at liberty to, and it will, in that event, be your duty to, find in favor of the presumption of such a deed or contract of sale. But if you· believe from the evidence that it is more probable that there was not any such deed or contract of sale made prior to said date, it will be your duty to find against such a presumption. If you find in favor of the presumption, and if you further believe from the evidence that Adelard Bourgeois at the time he purchased on the 18th day of May, 1858, had notice or knowledge of such a prior presumed deed or contract of sale, then it will be your duty to find that he did have such knowledge or notice; but, if you do not so believe from the evidence, it will be your

duty to find that he did not have such knowledge or notice.

"In this connection you are instructed that a prior sale or contract of sale of 100 acres to Woodyard and Morgan by Mrs. Goodman, and the knowledge by Bourgeois of such sale or contract of sale may be shown by circumstances, as well as by direct evidence, or both.

"Guided by the foregoing instructions given you, you are instructed to answer the following questions:

"First Issue: From a fair consideration of all the facts and circumstances in evidence, do you believe that at the time T. J. and Sarah Goodman conveyed to Adelard Bourgeois the land described in the deed from them to him on the 18th day of May, 1858, the said T. J. and Sarah Goodman had already sold or contracted to sell to J. B. Woodyard and Eliza Morgan 100 acres to be taken out of the Goodman 704-acre tract in the Jno. Brown Jones survey wherever said Woodyard and Mrs. Morgan might select?"

To this issue the jury answered: "Yes."

"If you have answered the first issue above submitted in the affirmative, and only in such event, answer the following issue:

"Second Issue: If a deed or sale or contract of sale was made by T. J. and Sarah Goodman to J. B. Woodyard and Eliza Morgan before the 18th day of May, 1858, do you believe from the evidence that Adelard Bourgeois, when he purchased on the 18th day of May, 1858, had any notice or knowledge of any such prior deed or sale or contract of sale?"

To this issue the jury answered: "Yes."

"If you have answered the two preceding issues in the affirmative, and only in such event, you will answer this issue:

"Third Issue: Did the said J. B. Woodyard and Eliza Morgan, or those who acquired their interest in pursuance of the right to select, as expressed in their deed from Sarah Goodman of date April 11, 1860, and after the deed was executed, make a selection of a particular part of said 704-acre tract as their own?"

To this issue the jury answered: "Yes."

"Defendants claim title through two deeds to Mrs. E. J. Humble together calling for a tract of 100 acres of land, one of which is from E. J. Hogan dated November 4, 1869, and the other is from John and Mary E. Thornton dated November 15, 1870, in which deeds the land which they purport to convey is described substantially as follows:

" 'A tract of 100 acres of land out of the north part of the J. B. Jones headright situated on the west fork of the San Jacinto river about eighteen miles northeast of the city of Houston, in Harris county, Texas, beginning for the northwest corner of the said 100-acre tract a post oak stump with living branches growing on it near the ground, from which a forked mulberry 6 inches in diameter marked X bears north 65° east 10⅔ varas, and a pine 6 inches in diameter marked X bears north 74° west 10 varas, all standing on the south bank of the San Jacinto river; thence south 230 varas to a stake on the north line of the Joseph Dunman survey; thence east 220 varas with Dunman's north line to a stake from which a pine 16 inches in diameter marked V bears north 55° east 4⅛ varas, the same being the northeast corner of the Joseph Dunman's; thence south 437 varas with Dunman's east line to a stake; thence east 571 varas to a corner in a thicket of cane, vines and briars; thence north 651 varas to a corner on the south bank of the San Jacinto river, bearing trees, a birch 20 inches in diameter, a white oak 10 inches in diameter, and an ash 8 inches in diameter, all marked T, facing the corner; thence up the San Jacinto river with all of its meanderings to the place of beginning.'

"In this connection you are instructed that in the event you have answered the preceding three issues in the affirmative, and only in that event, you will decide where the land described in said two deeds to Mrs. Humble is situated on the ground, and what is the present description thereof, and, as a guide in determining the location and correct description of said land, the court instructs you that, in ascertaining and determining the boundaries of the land described in such deeds, you are required, as far as it is possible to do so, to follow the footsteps of the original surveyor who made the survey of the land described in said deeds, and, in endeavoring to follow the footsteps of the surveyor, you are charged that ordinarily the calls in a deed for natural and permanent objects are of the first or highest importance when they are found and identified, and that calls in field notes for artificial objects such as marked trees, marked lines, etc., are ordinarily second in importance, and that ordinarily calls in the field notes for course and direction are third in importance, and ordinarily calls for distance are fourth in importance, and calls for quantity may also be considered, but that the calls for neither class will absolutely control the calls of any other class, where calls of such other class or classes more truly indicate the footsteps of the surveyor and the true location and position of the land surveyed and described in the field notes set forth in the deed, and, in determining the position of the land in question, you are to consider all of the evidence admitted by the court bearing upon that subject, and you will locate the land where such evidence indicates to you is its true position as originally surveyed and located under the field notes in the aforesaid deeds to Mrs. E. J. Humble.

"The call in field notes for the beginning corner is of no higher dignity or greater importance than the call for any other corner which is equally as well established and identified. If any corner called for in the field notes is found and identified, the jury is authorized to locate the land by beginning at that corner and reversing the calls or the order of the calls, or such of them as may be necessary, and follow them out in reverse order, if the jury believe from the evidence that to do so will most accurately indicate the true position of the land as surveyed and described.

"You are not authorized to extend the distance called for in the field notes set forth in the deed merely to reach some line or object which is now found on the ground, but which is not called for in the field notes, as being a line or boundary of the land described. Distances set down in the field notes will control supposed lines or objects on the ground which are not called for in the field notes, unless the actual footsteps of the original surveyor are proved.

"Ordinarily the call in the field notes for an unmarked line, the position of which is uncertain or in dispute, or can be ascertained only by course and distance from some other line which is uncertain or in dispute, is not superior to and will not control a call for course and distance; but, in determining whether to give effect to a call for course and distance or a call for an unmarked, uncertain, or disputed line, the jury will adopt whichever call most truly indicates the correct position of the land under all of the evidence in the case taken together, and, where such calls are conflicting, the effect should be given to the one which is most harmonious with the other calls in the deed.

"Keeping in mind the foregoing instructions with reference to calls of boundary, you will answer the following four issues, in the event that you have answered the preceding three issues in the affirmative:

"Fourth Issue: At what point is the interior west corner of the selected tract located? State the location thereof by distance and direction from any object, natural or artificial, or from any marked line or corner, or give any other definite means of its location."

To this issue the jury answered: "Interior west corner is located 5,260 vrs. north of the south line of the John Brown Jones survey, and is the same as the northeast corner of the Jos. Dunman 279½-acre tract."

"Fifth Issue: "Where is the lower southwest corner of the selected tract located? State the distance and direction of the same from any object, natural or artificial, or marked line or corner, or give any other definite means of its location."

To this issue the jury answered: "Lower southwest corner is located 437 vs. south of the northeast corner of and on the east line of the Jos. Dunman 279½-acre tract."

"Sixth Issue: Where is the northeast corner of the selected tract on the San Jacinto river located? State the location thereof by distance and direction from any object, natural or artificial, or give any other definite means of its location."

To this issue the jury answered: "The northeast corner is located at a point on the San Jacinto river on a line running due north and south 571 vs. east of the east line of the Jos. Dunman 279½-acre tract."

"Seventh Issue: Where is the southeast corner of the selected tract located? State the location thereof by distance and direction from any object, natural or artificial, or from any other corner of the selected tract, or give any other definite means of its location."

To this issue the jury answered: "The southeast corner is located 571 vs. due east from the lower southwest corner as located in the 5th issue."

"If under the first two issues submitted to you above, you have found that there was a sale or contract of sale as therein inquired about between the Goodmans and J. B. Woodyard and Eliza Morgan, and that Adelard Bourgeois knew of the same prior to his purchase from the Goodmans on the 18th day of May, 1858, then you will consider and determine whether the said Woodyard and Morgan or their successors in title and Adelard Bourgeois or his successors in title agreed upon a partition, either orally or in writing, or both, of the interest owned by them, respectively, in the 704 acres of the John Brown Jones original survey formerly owned by Mrs. Goodman. In determining this issue, you may consider all of the circumstances in evidence, as well as the direct evidence, or both, and will answer this:

"Eighth Issue: From a fair consideration of all the circumstances and facts in evidence, do you believe that the said parties did, orally or in writing, or both, agree upon a division of their interests in said 704-acre tract, so that the successors in title of Woodyard and Mrs. Morgan did take, and were allotted as their own, a specific part of said 704 acres, and the said A. Bourgeois or his successors in title did take, and were allotted as his or their own, a certain part of said 704 acres, and that said respective parties or their successors in title did afterwards acquiesce in such partition, and claim as their own the tracts allotted to them or their predecessors in title, respectively?"

To this issue the jury answered: "Yes."

"If you have found under the above issue that a partition was made as therein inquired about, then and under the ninth issue you will describe the tract allotted to said Woodyard and Mrs. Morgan or their successors in such partition, if any.

"Plaintiff alleges in his supplemental petition that if defendants or any of them ever had any undivided interest in the land sued for by plaintiff, or sued for by defendants, then and in such event that they and their predecessors in title have had an oral or written partition with plaintiff and his predecessors in title whereby, if they are entitled to recover any land, they are entitled to the following tract:

"Situated on the west prong of the San Jacin-

to river about 18 or 20 miles northeast from the city of Houston, beginning at the point for the northwest corner of the 100-acre tract on the San Jacinto river, which is due north of a point 220 varas west of the northeast corner of the Dunman 279½ acres tract, which is now the northeast corner of the Bissonnet tract, and from said beginning point run thence south 230 varas to point for corner on the north line of what is now the Bissonnet tract; thence east 220 varas to a stake from which a pine 16 in. in diameter marked V stood north 55 deg. east 4⅓ vrs., the same being the northeast corner of the said Dunman 279½ acres, and now the northeast corner of the Bissonnet tract; thence south 437 varas; thence east 571 varas; thence north 651 varas to the San Jacinto river an oak tree marked T; thence up the San Jacinto river with all of its meanderings to the place of beginning, and being a part of the property sued for by the plaintiff in his original petition.

"On the other hand, the defendants contend in the first count of their plea of partition that a partition was made as instructed in connection with the eighth issue, and that therein the successors to the Woodyard and Morgan title were allotted the following tract:

"Situated on the west prong of the San Jacinto river about 18 miles northeast from the city of Houston, beginning at the northwest corner of said one hundred acres, a post oak stump with living branches growing on it, from which a forked mulberry six inches in diameter marked X bears 65 deg. east 10⅖ varas; thence south 230 varas to corner; thence east 220 varas to a stake from which a pine 16 inches in diameter marked V bears N. 55 deg. east 4⅓ varas, the same being the northeast corner of Joseph Dunman; thence south 437 varas with Dunman's east line to a stake; thence east 571 varas to a corner in a thicket of cane. vines and briars; thence north 651 varas to San Jacinto river, bearing trees, a birch 20 inches in D., an ash 8 inches in diameter, and a white oak 10 inches in diameter, all marked T; thence up the San Jacinto river with all its meanderings to the place of beginning. And that the lower south line thereof is located so as to run east and west, and with the west end of said line at a distance of 437 varas south of the north line of the Dunman 279½ acres established at 5,260 varas north of the south line of what is called the Joy survey.

"Under the pleadings and evidence, the court therefore submits the following:

"Ninth Issue: If you have answered the eighth issue in the affirmative, you will then find (and so state) what land was allotted to the successors in title of Woodyard and Morgan in said partition. In answering this question, you will state the boundaries thereof, and for the purpose of so doing may make reference to any of the descriptions in the pleadings, either wholly or in part, or to any objects which will identify the land."

To this issue the jury answered: "Beginning at a point 220 vs. west of the N. E. corner of the Jos. Dunman 279½-acre tract, which is 5,260 vs. north of the south line of the J. B. Jones survey; thence running east 220 varas; thence So. 436 vs. along the east line of the Jos. Dunman 279½-acre tract; thence east 571 vs.; thence due north to San Jacinto river; thence up the river with its meanderings to a point due north of, the place of beginning; thence south to place of beginning."

"Tenth Issue: What is the location of the south line of the John Brown Jones survey as called for in your answers to fourth and ninth special issues? State the location thereof with reference to any object. natural or artificial. or with reference to any marked line or corner, or give any other definite means of its location."

To this issue the jury answered: "The south line of the John Brown Jones survey begins at a point on the west line of the James Strange

survey 510 vs. north of the southwest corner of the James Strange survey, and runs due west 1,444 vrs."

After answering the foregoing issues, the court submitted new tenth issue, as follows:

"You are instructed it is necessary for you to fix the south line of the John Brown Jones survey as originally located more definitely than in the answer already made to the tenth issue. Give, if you can, its location with reference to objects, natural or artificial, or with reference to any undisputed marked line, or with reference to course and distance from any object, natural or artificial, or from any undisputed marked line, or in any other way which will definitely locate the same, and in this connection you are instructed to make a new answer to the tenth issue in lieu of the answer already made by you to said issue, letting such new answer be signed by your foreman, designating the same as 'New Answer to Tenth Issue.'"

To this issue the jury answered: "The south line of the John Brown Jones survey is the as the south line of the Joy survey."

Upon the verdict thus returned, judgment was rendered in defendant's favor for a 157-acre tract, being the same described in the answer to the ninth issue, and in the judgment is described as follows:

"Beginning at a point on the north line of the Joseph Dunman 279½-acres tract in the John Brown Jones survey, which point is exactly 220 varas west of the northeast corner of the said Joseph Dunman 279½-acres tract, and is exactly 5,260 varas north from the south line of the John Brown Jones one-third league survey established at and on the south line of the Garrett Joy survey as marked on the ground, and which beginning point is exactly 5,260 varas north of the south line of the said Garrett Joy survey as marked on the ground, and from said beginning point run thence east exactly 220 varas to the northeast corner of said 279½-acres tract; thence south exactly 437 varas along the east line of said Joseph Dunman 279½-acres tract to a point for southwest corner which is 1,569 varas more or less north of the W. T. Payne tract as marked on the ground; thence east exactly 571 varas to a point for southeast corner; thence due north to the San Jacinto river, a distance of 1,152 varas, more or less; thence up the San Jacinto river with its meanderings to a point due north of the place of beginning; thence south 851 varas, more or less, to the place of beginning; and containing within said bounds 157 acres of land, more or less, exclusive of the part thereof which conflicts with the Wm. J. Bissonnet tract in the John Brown Jones survey, being the same tract bounded as found by the jury in their several answers, the two descriptions found by the jury describing one and the same tract."

Judgment was also rendered in plaintiff's favor, first, for a 5-acre tract lying west of and adjacent to above-described 157-acre tract, and, second, for a 16-acre tract lying east of and adjacent to said 157-acre tract; said 5 and 16 acre tracts so adjudged to plaintiff Hermann being all of the land sued for and described in his petition, except the 157 acres adjudged to the defendants. Other features of the judgment need not be noticed.

From this judgment plaintiff, Hermann, has appealed, presenting an unconscionable and wholly unnecessary number of assignments. Since the issues involved are very limited, and are in no wise proportionate to the number of assignments presented—the latter merely presenting in different forms

the same questions—we will not discuss the same in detail, but express generally our views upon what are conceived to be the issues controlling a proper disposition of the appeal.

Prior to and for several years after the execution of the deed from Sarah Goodman to J. B. Woodyard and Eliza Morgan, dated April 11, 1860, Woodyard lived upon the premises in controversy and operated a ferry across the San Jacinto river. He was there as early as 1859, and according to some of the testimony as early as 1853 or 1854. He built a house on the land and cultivated a few acres which he had inclosed near the same. He lived there and operated the ferry until about the close of the war. Eliza Morgan lived with him, presumably as his wife, and during their joint occupancy they claimed to own the land under purchase from Sarah Goodman. It was known as the Woodyard place and Woodyard ferry or crossing for a number of years. After Woodyard left the place, it was occupied by one Roberts as tenant of Woodyard. In the meantime, it seems Eliza Morgan had abandoned Woodyard and married Hogan. Hogan and wife attempted to oust Roberts. This effort resulted in a difficulty in which Hogan was killed. Thornton, who, as indicated above, had purchased Woodyard's half interest, then took possession of the place and operated the ferry for about two years. After the sale of the land to Mrs. Humble by the Thorntons and Mrs. Hogan, she and her husband, P. S. Humble, took possession thereof and operated the ferry. He and his family lived upon the place for several years, operating the ferry, and running a small grocery store in a house which he built near the ferry, and cultivated the small field which had been placed in cultivation originally by Woodyard. Adelard Bourgeois was a Frenchman who came to Texas from Louisiana in the '50's, possibly as early as 1855. He and his wife had a large family of children and lived about 2½ miles from the ferry. He and family used the ferry. He died about 1859; the exact date of his death not being shown. The surviving wife with her family continued to reside at the same place until about 1868 or 1869, when she married a man named West and moved to a point about ten miles distant from the ferry. She died in 1885. The children scattered after Mrs. Bourgeois' marriage to West; but some of them and their descendants continue to reside in Harris county up to the present time. One son resided there at time of trial and testified as a witness for plaintiff. Neither the widow nor children are shown to have ever paid taxes on the Woodyard-Morgan tract, or asserted any claim thereto. The only testimony showing any claim on the part of Adelard Bourgeois is that of his son J. D. Bourgeois, who is now claiming an interest in the land, and who testified to a blazed line to the riv-

er; that his father claimed the tract to the river and the river as his north line; that Woodyard got a 60-foot tree from his father to make the gunnels of his ferry, and in consideration thereof agreed that the Bourgeois family could cross on the ferry free. He did not state where the tree came from. The tax records of Harris county show that Adelard Bourgeois rendered for taxes 604 acres of land in the J. B. Jones survey for the years 1858, 1859, and 1860. There has been payment of taxes and continuous active assertion of ownership by Mrs. Humble and those claiming under her down to and including the defendants.

Plaintiff did not know when he purchased the interests of the widow and heirs of Adelard Bourgeois in the estate of said Bourgeois that the land in controversy belonged to said estate. He had always heard the land called the "Woodyard tract," and supposed up to a short time before this suit was filed that Woodyard had owned the land, and that defendants had title thereto through Woodyard.

[1] The sufficiency of the evidence is questioned to authorize the submission of the first issue, and to support the finding of the jury in response thereto that at the time T. J. and Sarah Goodman conveyed to Adelard Bourgeois by deed dated May 18, 1858, the said Goodmans had theretofore sold or contracted to sell to Woodyard and Eliza Morgan 100 acres out of the Goodman 704-acre tract wherever said Woodyard and Morgan might select.

Upon a former appeal of this case, Chief Justice Pleasants, of the Galveston Court of Civil Appeals (141 S. W. 574), in commenting upon the propriety of submitting such an issue, and the probative force of the facts in evidence, said:

"While the evidence does not raise the issue of presumption of a deed submitted to the jury by the charge of the court, it does raise the issue of a sale or contract of sale by Sarah Goodman and her husband to J. B. Woodyard and Eliza Morgan of the 100 acres described in the deed to them by Sarah Goodman before set out, made prior to the conveyance to Bourgeois of the 602 acres of land described in the deed to him, and known to said Bourgeois at the time he purchased. Such sale or the existence of such contract of sale and the knowledge thereof by Bourgeois at the time of his purchase are entirely consistent with the facts shown by the evidence, and explains the apparent inconsistency in the description of the land in the deed to him by the Goodmans.

"If, as a matter of fact, the Goodmans had, prior to the execution of their deed to Bourgeois, sold or contracted to sell 100 acres of the land on the Jones survey owned by them to Woodyard and Mrs. Morgan, and Bourgeois knew of this sale or contract of sale, the deed to him from the Goodmans was not intended to and did not pass title to him to this 100 acres, because it was not 'unsold' at the time said deed was executed.

"The evidence authorizes the finding that Woodyard had built a house upon this land, and was living there with Mrs. Morgan, operating a ferry, and cultivating a small portion of the land at the time and for several years prior to the conveyance to Bourgeois. Let us

suppose that, when Bourgeois purchased the land from the Goodmans and took the deed from them, they said to him: 'We have sold or have agreed to sell and convey to Woodyard and Mrs. Morgan 100 acres of our land on the Jones survey to be selected by them. According to our deeds, after deducting this 100 acres, we have a balance of 602 acres, and we will sell and convey to you this 602 acres.' If Bourgeois purchased the land, and the deed was executed by the Goodmans, and accepted by him, with this understanding, we think it clear that no title to the 100 acres passed to him by said deed. The circumstances shown by the evidence are amply sufficient to sustain the finding that such sale or contract of sale had been made by the Goodmans, and that Bourgeois purchased the land with knowledge of the existence of such sale and the right of Woodyard and Mrs. Morgan to 100 acres out of the Goodmans' land on the Jones survey. The deed recites that the land conveyed is 602 acres, which is within 2 acres of the amount that the Goodmans would have owned in the survey after deducting 100 acres if the land contained the exact number of acres called for in the deeds under which they claimed. After his purchase Bourgeois, in rendering his land for taxes, rendered it as 604 acres, which was the exact number of acres conveyed to him after deducting the 100 acres if the number of acres stated in the deed to Goodman was correct, thus indicating that, while his deed only called for 602 acres, he understood that it conveyed to him all of the land then owned by the Goodmans on the Jones survey, except the 100 acres sold or contracted to be sold to Woodyard and Mrs. Morgan, and, according to the acreage called for in the deed to Goodman, he (Bourgeois) owned 604 instead of 602 acres. We think this rendition by Bourgeois is very significant. The year that he purchased the land and each year thereafter up to the time of his death he rendered the land as 604 acres. This, as before stated, was the exact number of acres sold to him, if Woodyard's 100 acres were not included, and the acreage called for in the deed to Goodman was correct. The fact that he rendered his acreage when his deed called for only 602 acres indicates that he understood that he had bought all of the land except that previously sold, and, according to the deeds to Goodman, the amount sold him was 604 instead of 602 acres as recited in his deed. If he estimated the number of acres rendered for taxes by him in this way, it is apparent that he understood that the Woodyard 100 acres was not included in the deed to him; otherwise he would have rendered 704 acres instead of 604.

"These circumstances, taken in connection with the notorious and long-continued possession and claim of Woodyard and Mrs. Morgan and, those claiming under them, and the acquiescence of Bourgeois and his heirs in such claim, are sufficient to authorize the finding that the conveyance by Sarah Goodman, presumably after the death of her husband, to Woodyard and Mrs. Morgan of 100 acres of the land, was in pursuance of a sale or contract made by Mrs. Goodman and her husband prior to their conveyance to Bourgeois, and that Bourgeois had knowledge of such sale or contract of sale at the time he purchased, and said 100 acres was therefore not included in the deed to him.

"If, upon another trial, the jury should find this state of facts to exist, the jury should find for the defendants for 100 acres of the land."

This quotation most aptly expresses the views of this court upon the question. We would add nothing thereto, except to call attention to the fact that the consideration expressed in the deed from the Goodmans to Bourgeois was $602, corresponding to the 602 acres which the deed purported to convey. This coincidence in numbers is strongly in-

dicative that 602 acres only was intended to be conveyed at a price of $1 per acre, and it, too, is regarded as significant. It is a coincidence similar to the coincidence in number of acres rendered for taxation.

Under the views expressed, it follows that verdict and judgment was properly rendered in defendants' favor upon this phase of the case. The other issue relates to the boundary of defendant's land.

We concur in the former holding of the Galveston court that the deed from Sarah Goodman and husband to Woodyard and Eliza Morgan conveyed 100 acres only, and defendant's recovery should be limited to that amount, unless there are extraneous circumstances by which this acreage may be enlarged. At the time of the conveyance to Mrs. Humble by Mrs. Hogan and the Thorntons, the right of selection vested by the Goodman deed had been exercised, as these conveyances undertook to convey a specific portion of the land. Mrs. Humble and her vendees were concluded by the selection so made. The jury has found a partition to have been made by the owners of the 704-acre tract, and that the tract allotted to the Woodyard-Morgan interest was as is described in the Thornton-Hogan deeds to Mrs. Humble. It is shown that the boundaries of this tract inclose more than 100 acres; but the partition was sufficient to vest in the Woodyard-Morgan interest the lands embraced within the boundaries given in the Thornton-Hogan deeds, and the circumstance that they contain more or less than 100 acres is of no consequence. The partition passed the title to the additional acreage. The question is thus reduced to the task of establishing the boundaries of the Woodyard-Hogan tract, as originally located.

Just east of the Jones one-third league is situate the Joseph Dunman labor patented August 28, 1844, described as follows:

"Beginning at J. B. Jones' northeast corner a stake marked J. D. on the south bank of the San Jacinto river, bearing trees blazed; thence south 2,987 vrs. to a stake on J. B. Jones' east boundary line, from which a post oak (line tree) bears south 5 vrs; thence east 350 vrs. to a pine marked 8, bearing trees blazed; thence north 2,727 vrs. to a red oak 8 inches in dia. marked X, on the bank of the San Jacinto river, bearing trees blazed; thence up the river with its meanderings to the place of beginning."

The description of the foregoing tract is pertinent only in connection with description of the 7⅛ labors granted to James Strange by patent dated October 29, 1844, and bounded as follows:

"Adjoining J. B. Jones' and J. Dunman's surveys, beginning at J. Dunman's northeast corner on the south bank of San Jacinto river a red oak marked X, bearing trees blazed; thence south 2,727 vrs. to J. Dunman's southeast corner to a pine marked 8, bearing trees blazed; thence west to J. Dunman's southwest corner 350 vrs. to a stake from which a line tree marked O bears south 5 vrs.; thence south 3,168 vrs. to stake and mound in the prairie (thence east 1,444 vrs. stake and mound in the prairie); thence north 5,645 vrs. to a red oak marked R. D. and J. B. J. on the

bank of the San Jacinto river, bearing trees blazed; thence up said river with its meanderings to the place of beginning."

The Garrett Joy tract is a recent survey patented in 1903, and contains 116²/₁₀ acres, described as follows:

"Beginning at a post in the prairie the southwest corner of the John Brown Jones one-third league, and on the east line of the W. B. Adams two-thirds league and labor survey, said beginning point being 5,895 vrs. south of the south bank of the west fork of the San Jacinto river; thence south 437 vrs. to the northwest corner of H. E. and W. T. Ry., section No. 5; thence east along an old hacked line through timber marked as north line of said section No. 5 in the original survey of same at 1,504 vrs. a post set for northeast corner section No. 6 in west line J. Strange one-third league; thence north 437 vrs. to S. E. corner of J. B. Jones survey; thence west 1,504 vrs. to the place of beginning."

It is apparent that, according to the finding of the jury, the Joy survey embraced land situate in the John Brown Jones one-third league. By decree of the district court of Harris county, dated January 22, 1894, in partition proceedings between Hermann and the heirs and vendees of the remaining undivided Bourgeois interest, a 434.92-acre tract was allotted to Hermann out of the John Brown Jones tract and Joseph Dunman labor, described as follows:

"Beginning at the N. E. corner of the Dunman labor; thence south 1,904.8, varas; thence west 182.2 varas; thence south 567.2 varas to Payne's north line; thence west 874.8 varas to said Payne's N. W. corner; thence north 1,569 varas to the S. W. corner of 100-acre survey sold to J. B. Woodyard; thence east 571 varas to its S. E. corner; thence north 651 varas to its N. E. corner, and the south bank of the San Jacinto river; thence down said river with its meanders to the place of beginning."

The east line of the Joseph Dunman 279½ acres is a well-marked, established, and recognized line. The stake and bearing tree at its northern terminus called for in the deeds to Mrs. Humble and from Sarah Goodman and husband to Dunman cannot be found. The location of its north line called for in deed from Mrs. Hogan to Mrs. Humble is uncertain; likewise its south line.

The black-jack at southeast corner of the John Brown Jones cannot be found. The location of this corner, as well as the southwest corner of the grant, and the south line thereof, is uncertain.

Since the east line of the Dunman 279½-acre tract is established and recognized, there is no difficulty in locating the northwest corner of the Woodyard-Morgan tract at a point on the San Jacinto river 220 varas west of a northerly extension of the Dunman east line to the river. Such location corresponds with the deeds to Mrs. Humble, and the judgment of the court fixed it at this point. The northeast corner is likewise readily located on the river 571 varas east of such extended line, and the verdict and judgment fixes it at such point. It will be observed that the calls in the deeds to Mrs. Humble are such that, if the north line of the Dunman 279½-acre

tract, and the northeast corner thereof, can be located with sufficient certainty, they would control the call for distance of 230 varas from the beginning (northwest) corner on the river. Thatcher v. Matthews, 101 Tex. 122, 105 S. W. 317; Wm. M. Rice Institute v. Gieseke (Civ. App.) 154 S. W. 612.

The finding of the jury in response to the fourth issue undertook to locate this corner, which necessarily also located the north line. This being located, the court gave judgment for defendants locating the northwest and northeast corners at the points indicated above, but gave controlling effect to the call for north line of the Dunman 279½-acre tract, and extended the first call to reach the supposed north line a distance of 851 varas, instead of 230 varas, as called for in the deeds. This of necessity extended the eastern line to a length of 1,152 varas, instead of 651 as called for. The court correctly so extended these eastern and western lines if the northeast corner of the Dunman 279½-acre tract was properly located by the jury. Such northeast corner, according to the description contained in deed from Sarah Goodman and husband to Dunman, was 5,-260 varas north of the south line of the John Brown Jones one-third league, and the jury in response to the fourth issue so located it. Thus the whole boundary question finally depends upon the location of the south line of the original grant to Jones. Responding to the tenth issue, the jury fixed this line as "beginning at a point on the west line of the James Strange survey 510 varas north of the southwest corner of the James Strange survey, and runs due west 1,444 varas." This answer not being sufficiently definite, the new tenth issue was submitted, in response to which the line was described as being "the same as the south line of the Joy." The evidence discloses that the south line of the Joy is 510 varas north of the southwest corner of the Strange, so the answers to the tenth and new tenth issues are in perfect accord. The Joy line, however, is well marked and known.

The Joy tract was 437 varas wide from north to south, so the effect of the findings to the two tenth issues was to place the southwest corner of the John Brown Jones, and the south line thereof, 6,332 varas south from its northwest corner on the river, instead of 5,895 varas as called for in patent. It was so fixed in an effort to follow the footsteps of the original surveyor of the Jones. There is perhaps no rule more helpful in reaching a correct conclusion as to the location of boundaries than that which directs that the footsteps of the surveyor are to be followed. But conveyances of land rest upon written evidence, and not in parol; therefore in tracing and following his footsteps we must be guided by and follow in accordance with the directions which he has given in the field notes incorporated in the grant. If to retrace the steps of the surveyor, regardless of the field notes, were permissible, and the proper manner in which to construe the boundaries of a grant, then all land grants would rest in parol. It is simply the same rule respecting the construction of written contracts which is so familiar: The intention of the parties is to be ascertained and shall control; but this intention must be ascertained in the light of the written memorandum of it made for the purpose of evidencing it. So the footsteps of the surveyor are to be retraced, but only so in the light of the written evidence thereof, as incorporated in the field notes.

The location of the south line of the Jones 6,332 varas from its northwest corner on the river in contradiction of the distance call of 5,895 varas cannot be permitted. The field notes of the Jones do not call for any of the surrounding surveys which would permit the call for distance to be disregarded. J. W. Gillespie, surveyor and witness for defendants, assisted his father in surveying the lands in the Jones grant partitioned in 1894 between Hermann and the remaining Bourgeois' interests, and he testified:

"Mr. Dunman did actively assist us all in making the survey, helping us to locate the corners of the lines. He was with us all the time. He showed us what he knew about the country, showed us old lines and corners as he had known them. He was an old settler there. * * * In making this survey at the south end of the Jones, we started first at the river, over on the west line of the Jones, and run down the call distance, 5,895 varas, that is over here, right on the west line there. When that distance expired out there on the prairie, the bearing trees that were originally called for there, over to the southeast corner, were not there, and old man Dunman called our attention to the fact that we were not as far south as what they generally recognized that line to be, and he called our attention to the fact that if we would go over to the east, on the Dunman one-third league (that is, east of the Strange—it does not show on this map), and come around it, according to its notes, and then to the Strange (the Strange is east of the Jones), and put in the Jones according to the calls of the Strange and the sections around there, that we would be further south than where we would be if we took the northeast corner of the Jones at the river and ran there, and we did that. We went around to the Dunman and got the southeast corner of the Dunman, and went according to its call distance to get the difference between it and the Strange, and then came down the south line of the Strange to the southeast corner and north 510 varas and established that corner; that would be this corner; established the southeast corner of the Jones. The Robert Dunman one-third league and the Strange survey are old ones. I do not remember which is the older of the three, the Jones, Strange, or Dunman; but they were all about the same age. I would have to look at the patent. They go away back about 1845, I think, somewhere along in there. I think they are all about the same date. We did establish the south line of the Jones there at that time, 510 varas north of the southwest corner of the Strange. We established it here, 510 varas. The northwest corner of the Strange I just referred to would be here, as indicated on the map. The map says, 'J. Strange,' and I say, as the map indicates, that would be the southwest corner (on map marked Exhibit D) is that line. South line and southwest corner of the Strange sur-

vey are well established and recognized on the ground; there is a dispute here; was here at one time between Mr. Hermann and Mr. Sears, and they settled it and established it just as represented there; Hermann and Sears established it; they had a dispute in there. * * * When we all got down there, when we went around and made that survey that I spoke of, at Mr. Joseph Dunman's instance, commencing somewhere about the Robert Dunman one-third league, and thence around the Strange, and up the west side of the Strange 510 varas and established that line there, Mr. Joseph Dunman did concur in it and approve it. I don't know whether Mr. Dunman was a property owner in there anywhere or not. He was the son of old Joe Dunman, who had this 279½ acres. The reputation was that he was his son; he was reputed to be, in that community. I don't know how long he was reputed to have lived there. I have known him all my life. How long he lived there I do not know. He would just ride through the woods there, anywhere, any corner you might ask him to show you, and show you the corner and the bearing trees of the different surveys, original surveys. He never did anything except showed us the corners, except call our attention to that south line of the Jones. When we first located it, it was not as far south as they always claimed it. When we checked up with other surveys, we found it down there where he claimed they had always recognized it to be. I made this map. I have noted on here south of some dotted broken lines 'Joy.' there is sort of a dispute about that Joy tract, as to where it is; the Joy is a recent survey. I don't know within what period of time. I suppose some time about eight or ten years of this time; I think that's it. The patent will show the age of it. The survey south of the Jones is the Houston East & West Texas Railway section; that is older than the Joy. I have read the field notes of the original Houston East & West Texas Railroad survey, the original notes, and they call for on the north of that survey for the Strange and the John Brown Jones. I don't know how old that survey is, but it is older than the Joy. There was a patent on it. That Joy tract, the south line where somebody has gone there and established it, is well established so it can be identified on the ground. It is marked there on the ground, and it is right at the same place as I have put on that map, same place as I have located it. The south line of the Joy as represented here as the south line of the Jones, 510 varas north of the southwest corner of the Strange. As to why I put it that way, as being within the lines of the Jones, because the Joy calls for the north line of that railroad section and 510 varas from the Strange corner; but it runs up then into the Jones tract of land. If you establish the Jones at the 510-vara point north of the Strange, according to the construction I had of it, the Joy is within the lines of the John Brown Jones. The distance from the south line of the Joy, as marked on the ground, to the north line of the Joseph Dunman 279½ acres, as marked by me on that map, is 5,260 varas."

The evidence with respect to Dunman's understanding of the location of the south line of the Jones is insufficient to bring the case within the rule applied in the cases cited above. Of course, if the objects at southwest and southeast corners of Jones as called for could be found, they would control the distance call. Thatcher v. Matthews, supra. If they were missing, the same rule would apply if the point could be found where they had been formerly situated. The objects being missing, the jury undertook to locate the

points where they had been located, not as called for in the Jones field notes and in the light of the evidence furnished thereby, but by resorting to an old settler's understanding of how the line and corners could be found. Instead of adopting the data furnished by the field notes for locating the lines and corners, resort was had to what was generally reputed to be the proper way of finding same. In other words, the field notes in the grant were disregarded, and field notes supplied by an old settler substituted therefor. Had Dunman located a definite line as being the recognized established south line of the Jones, under authority of Wm. M. Rice Institute v. Gieseke, supra, that would perhaps have been sufficient to fix the location of the objects called for at southwest and southeast corners, and possibly warranted the jury in fixing the south line at a point more than 5,895 varas from northwest corner on the river. But Dunman did not testify to such a line. His testimony amounts to nothing more than what was the general understanding of the proper way to locate the south line, and to be guided thereby would be to give controlling effect to the 510-vara call in Dunman's field notes, over the 5,895-vara call in the field notes of the grant itself.

Upon careful consideration of all the facts, the conclusion irresistibly forces itself upon this court that there is nothing to warrant a disregard of the distance calls in the east and west lines of the Jones grant, and they must be given controlling effect. To hold otherwise under the facts here presented would flagrantly violate the rule which forbids the admission of extraneous evidence to vary or contradict the field notes of a grant, in a case where no ambiguity is present or any of the other well-defined exceptions to such rule. There is some evidence in the record of recognition of lines upon Hermann's part, contrary to that now contended for by him, but unaccompanied by any acts upon which an estoppel might be predicated, nor are there any other facts which would preclude him from asserting his present claim. No such issues were submitted to the jury, and the judgment rendered is in no wise based thereon. The views herein expressed upon the boundary question are well settled, and citation of authority is perhaps unnecessary; but in support generally thereof we refer to the following, in addition to the two cases cited above, viz.: Railway v. Anderson, 36 Tex. Civ. App. 121, 81 S. W. 781; Booth v. Upshur, 26 Tex. 64; Upshur Co. v. Lewright, 101 S. W. 1013; Thompson v. Langdon, 87 Tex. 258, 28 S. W. 931; Johnson v. Archibald, 78 Tex. 102, 14 S. W. 266, 22 Am. St. Rep. 27; Goodson v. Fitzgerald, 40 Tex. Civ. App. 619, 90 S. W. 898; Tippen v. McCampbell (Civ. App.) 26 S. W. 647; Hamilton v. Blackburn, 43 Tex. Civ. App. 153, 95 S. W. 1095; Chew v. Zweib, 29 Tex. Civ. App. 311, 69 S. W. 210; Goldman v. Hadley (Civ. App.)

122 S. W. 282; Sloan v. King, 33 Tex. Civ. App. 537, 77 S. W. 50; Brodbent v. Carper (Civ. App.) 100 S. W. 183; Barnett v. Mahon, 31 S. W. 331; Guill v. O'Bryan (Civ. App.) 121 S. W. 596; Hamilton v. Blackburn, 43 Tex. Civ. App. 153, 95 S. W. 1095; Goodson v. Fitzgerald, 40 Tex. Civ. App. 619, 90 S. W. 898; Anderson v. Stamps, 19 Tex. 460.

Appellees cite a number of cases where calls for lines of adjacent surveys were given controlling effect over calls for distance. See Freeman v. Mahoney, 57 Tex. 626; Maddox v. Fenner, 79 Tex. 279, 15 S. W. 237; Langerman v. Nichols, 32 S. W. 125; King v. Mitchell, 1 Tex. Civ. App. 701, 21 S. W. 51; Schaeffer v. Berry, 62 Tex. 705; Booker v. Hart, 77 Tex. 146, 12 S. W. 16; Fordtran v. Ellis, 58 Tex. 251; Byrd v. Langbein (Civ. App.) 135 S. W. 207; Goodson v. Fitzgerald (Civ. App.) 135 S. W. 696; Steusoff v. Jackson, 40 Tex. Civ. App. 328, 89 S. W. 445.

These authorities have no application as the field notes of the Jones do not call for any surrounding survey. This cause has been twice tried, and the evidence fully developed. There is no occasion to remand for retrial, but the judgment of the trial court will be reformed in the following particulars:

First. The description of the land adjudged to appellees is amended so as to read as follows: Beginning at a point on the south bank of the San Jacinto river 220 varas west of a northerly extension of the east line of the Joseph Dunman 279½-acres tract; thence south exactly 230 varas to a point for corner; thence east 220 varas to point for corner; thence south 437 varas to a point, which point is 2,190 varas, more or less, north of the W. T. Payne tract, as marked on the ground; thence east exactly 571 varas to point for southeast corner; thence due north to the San Jacinto river a distance of 531 varas, more or less; thence up the river with its meanderings to the place of beginning; and containing within said bounds 107.4 acres, more or less, exclusive of the part thereof, if any, which conflicts with the Wm. J. Bissonnet tract, in the John Brown Jones survey.

Second. That plaintiff, George H. Hermann, in addition to the premises decreed to him in said judgment, do have and recover of and from the defendants, and each of them, all of the premises sued for by him, as described in his petition, which lies south of the above-described tract, adjudged to the defendants, and more particularly described as follows: Beginning in the south line of the tract of land sued for by plaintiff, at the southwest corner of the 16-acre tract of land adjudged to Hermann by the judgment of the trial court; thence west 571 varas following the south line of the tract sued for by plaintiff to lower southwest corner of land sued for, a stake in the east line of old Humble tract, a sapling pine mkd. —— stands for corner, from which a pine stump bears S.

10° E. 10 feet distant, and a sapling bears N. 25° W. 10 feet distant; thence north 251 varas, more or less, along an old blazed line to the lower southwest corner of the above-described tract herein adjudged to the defendants; thence east along south line of defendant's said tract, as herein adjudged to them, to the southeast corner thereof a distance of 571 varas; thence south 251 varas, more or less, to the place of beginning; and containing 25⅛ acres, more or less.

Appellees by cross-assignment present the proposition that the deed from Sarah Goodman and husband dated May 15, 1858, is void, because of insufficiency of description of land conveyed. It is regarded as being without merit, and is overruled. The judgment of trial court will be reformed to conform to the views expressed in this opinion.

Reformed and affirmed.

### On Rehearing.

In the original opinion it is said:

"The jury has found a partition to have been made by the owners of the 704-acre tract, and that the tract allotted to the Woodyard-Morgan interest was as is described in the Thornton-Hogan deeds to Mrs. Humble. It is shown that the boundaries of this tract inclose more than 100 acres; but the partition was sufficient to vest in the Woodyard-Morgan interest the lands embraced within the boundaries given in the Thornton-Hogan deeds, and the circumstance that they contain more or less than 100 acres is of no consequence. The partition passed the title to the additional acreage."

The use of the term "partition" was unfortunate, and is calculated to convey an erroneous idea of the view of the court. In lieu thereof, "selection" or "segregation" would have been more properly employed.

Woodyard and Morgan acquired title to an undivided interest of 100 acres with right to select and segregate that amount, and no more. The Bourgeois interest could not in any wise have controlled or influenced the matter of selection so long as it was confined to 100 acres. But, if Woodyard and Morgan desired to select and segregate as their own a tract of more than 100 acres, they could do so with the consent and approval only of the Bourgeois interest. In using the term "partition," we had in mind a selection by the Woodyard-Morgan interest of a tract of more than 100 acres, and the selection and segregation so made being consented to and acquiesced in by the Bourgeois interest.

[2] In this connection, too, it may be well to say that, since the deeds to Mrs. Humble undertook to convey a particular portion of the tract, such conveyance of a particular portion unequivocally establishes that the selection and segregation had then or theretofore been made, and the court should so assume. Having once been made, the right was exhausted, and the respective interests were no longer undivided, but segregated and owned in severalty. Hence it follows that after such selection and segregation of interest there could be no subsequent or further

partition of undivided interests. Inquiry may properly be made as to consent and acquiescence, by Bourgeois and his successors in title subsequent to the date of Mrs Humble's deeds, in the segregation made. If they consented to and acquiesced in the selection of a tract of more than 100 acres, title to the excess would pass to the Woodyard-Morgan interest and their successors.

There is nothing in this record to warrant the submission of any issue of partition except along the general line indicated.

In connection with this question of right to hold in excess of 100 acres, we wish, however, to note that apparently no such issue can arise, if in locating the Woodyard-Morgan tract controlling effect be given to the calls for course and distance, rather than for north line and northeast corner of the Dunman 279½-acre tract. The two corners of the selected tract upon the south bank of river may be readily located with practical certainty. By constructing the survey running course and distance from either of these corners, it seems approximately 100 acres is included within its boundaries. Thus any issue respecting the right to hold in excess of that amount is eliminated, if in constructing the survey we are guided by course and distance. On the other hand, if controlling effect is to be given to the call for north line and northeast corner of Dunman tract, and it is found to be located as contended by appellees, then arises the issue noted.

[3] In this connection it is important that attention be directed to the rules of law governing the relative importance of these conflicting calls.

It has been held that a call for course and distance should not be subordinated to a call for an unmarked line which could not, of itself, be ascertained, except by running course and distance from an established point. Gerald v. Freeman, 68 Tex. 201, 4 S. W. 256; Johnson v. Archibald, 78 Tex. 96, 14 S. W. 266, 22 Am. St. Rep. 27; Robertson v. Mooney, 1 Tex. Civ. App. 379, 21 S. W. 143.

The leading case of Gerald v. Freeman, announcing this rule, however, has been subsequently explained, and the general rule thus announced somewhat limited, and it now seems to be the settled law that when the unmarked line of an adjacent survey is called for, and when from the other calls of such adjacent survey the position of such unmarked line can be ascertained with accuracy, and there is an absence of evidence as to how the survey was actually made, and there arises a controversy as to whether course and distance or the unmarked line of another survey shall prevail, there is no reason why the survey line should not be given the dignity of an artificial object and prevail over course and distance. Maddox v. Fenner, 79 Tex. 279, 15 S. W. 237; Wood v. Cahill, 21 Tex. Civ. App. 38, 50 S. W. 1071; Goodson v. Fitzgerald (Civ. App.) 135 S. W. 696; State

v. Russell, 38 Tex. Civ. App. 13, 85 S. W. 288; Steusoff v. Jackson, 40 Tex. Civ. App. 328, 89 S. W. 445; Davis v. Baylor (Sup.) 19 S. W. 523; Langerman v. Nichols (Civ. App.) 32 S. W. 124; Coleman Co. v. Stewart (Civ. App.) 65 S. W. 383; Shindler v. Lutcher (Civ. App.) 107 S. W. 941; Baker v. Light, 80 Tex. 627, 16 S. W. 330. This doctrine was applied in the case of Thatcher v. Matthews, 101 Tex. 122, 105 S. W. 317, where there was a call for 13,400 varas to stake in prairie. The stake had disappeared. It was held to be an artificial object, and, if the place where it was originally located could be established, the call for distance should yield to it; and it was held proper to extend the line an additional 1,200 varas to reach the point where the stake has been originally located. To the same effect is Wm. M. Rice Institute v. Gieseke (Civ. App.) 154 S. W. 612.

But we apprehend this rule does not apply, and a call for the line of an adjoining survey should not be permitted to prevail over a call for distance, unless such line itself can be located with reasonable accuracy and certainty. If the line of the adjoining survey so called for cannot be so located, it should be disregarded, and the terminus fixed according to the call for distance. Polk County v. Stevens (Civ. App.) 143 S. W. 204; Bigham v. McDowell, 69 Tex. 100, 7 S. W. 315. To do otherwise would be to accord to uncertainty precedence over that which is certain.

As was noted in the original opinion, the true location of the Jones south line is uncertain, and the north line and northeast corner of Dunman tract equally so, since they can be found only by running course and distance from the line of the Jones mentioned, and the jury so undertook to establish same.

The state of uncertainty was such that the trial court should have instructed the jury to disregard the call for the Dunman line and corner, and construct the survey by the calls for course and distance.

In this connection it may be again particularly noted that by constructing the survey according to course and distance approximately 100 acres will be contained in Woodyard-Morgan tract; whereas, to locate the Dunman line and corner as contended for by appellees, and permit the call for same to prevail, would embrace about 157 acres. So great an excess in the number of acres supposed to be contained in the tract is very persuasive in favor of the correctness of the distance calls.

If, upon retrial, the north line and northeast corner of the Dunman tract be fixed as contended by appellees and established with reasonable certainty, and if the jury finds that the call therefor should prevail over distance, but that the Bourgeois interest did not consent to and acquiesce in the selection and segregation of more than 100 acres,

then the defendants should be limited in their recovery to a tract of exactly 100 acres. With the river as the north boundary and the northeast and northwest corners susceptible of ready and accurate location, the jury can then fix the location of the south lines so as to embrace an acreage of 100 acres only. The location of the east and west lines presents no difficulty whatever.

[4] Upon the issue of consent and acquiescence upon the part of Bourgeois interest to the Woodyard-Morgan interest holding more than 100 acres, the evidence in the record here presented is insufficient. There is no such consent and acquiescence in the establishment of the south lines so as to embrace more than 100 acres as is necessary. The parties are not shown to have had any very definite idea of where the south lines were located; but all seem to have proceeded upon the theory that the tract contained only 100 acres. The entire evidence upon this phase of the case is wholly unsatisfactory and insufficient.

With reference to the evidence offered of a recognition and claim by Hermann in the Hermann-Payne partition suit that the south line of the Jones is at the point where it is claimed to be located by appellees, this is simply evidence for what it is worth of the location of the Jones line, and should be so treated. It does not estop Hermann from making a contrary contention in this proceeding.

Appellees contend the evidence discloses that the river has changed its location. There is no sufficient evidence of any substantial change, and we think there should arise no difficulty in finding the true northeast and northwest corners of the disputed tract.

Upon consideration of appellee's motion for rehearing, the conclusion has been reached that this court improperly undertook to finally dispose of the boundary issues. The order reforming and affirming will therefore be set aside, and the cause now reversed and remanded.

The original opinion, together with the modification and additional views herein contained, sufficiently indicate our views upon the controlling questions in the case. Upon retrial, we desire to emphasize the direction to the trial court not to submit any issue respecting the calls for north line and northeast corner of Dunman tract, nor in respect to the right to hold more than 100 acres, unless the evidence in respect thereto be legally sufficient. As presented by this record, it falls far short of being so.

Reversed and remanded.

McKENZIE, J. (concurring). In my opinion, the record discloses the necessity for remanding the cause for a retrial solely for the purpose of fixing the boundaries to a tract of land to contain 100 acres only, with the San Jacinto river as the fixed northern boundary thereof, the other boundaries to be located upon the ground by course and distance calls, to conform as near as is practicable to the field notes in the deeds of June 29, 1868, and November 4, 1869, which are fully set forth in the original opinion.

I have arrived at the above opinion by assuming (because of the jury's verdict) that prior to her deed of May 18, 1858, to Adelard Bourgeois, Sarah Goodman sold or had contracted to sell the 100 acres to be selected to J. B. Woodyard and Eliza Morgan, which sale or contract of sale was known to Bourgeois at the time he purchased from Sarah Goodman, and that Woodyard and Morgan exercised the privilege and made the selection of the 100 acres. Each of the deeds of June 29, 1868, whereby J B. Woodyard conveyed his interest by metes and bounds to the 100 acres to John and Mary E. Thornton, and the deed of November 4, 1869, whereby E. J. Hogan (formerly Eliza Morgan) conveyed her interest by metes and bounds to Mrs. E. J. Humble, refer to the Sarah Goodman deed of April 11, 1860, and the three deeds, when construed together, show an intent and purpose to sell, select, and locate only 100 acres. By making the selection and location, the Woodyard and Morgan tract became segregated from the Bourgeois tract. This segregation was brought about by a selection, and not by a partition. The record fails to disclose any issue of estoppel, whereby the Woodyard-Morgan tract is entitled to more than 100 acres of land. Under this state of the record then, the appellee should be allowed to recover only 100 acres of land, and no more. By the field notes and the evidence, it is quite clear that the 100 acres selected were located upon the San Jacinto river, the river forming the north boundary line. By the evidence, it is further shown that the east line of the Joseph Dunman 279½-acre tract, as called for in the field notes, is a well-marked line, found upon the ground, and recognized by both parties. By virtue of this affirmative showing, the location of the river, and of the east line of the Dunman tract, the location upon the ground of the Woodyard and Morgan 100 acres can be accurately fixed, and the boundary lines thereof accurately established, by resorting to the course and distance calls. The northeast corner of the Woodyard-Morgan 100-acre tract would be at a point on the south bank of the San Jacinto river 571 varas east of the northern extension of the recognized east line of the Joseph Dunman 279½-acre tract, and the northwest corner would be at a point on the south bank of the San Jacinto river 220 varas west of the northern extension of the east line of the said Dunman tract, and the remaining boundary lines of the tract are as readily established, keeping in mind the necessity of establishing the extreme southern boundary of said tract, so as to embrace within the boundaries of the Woodyard-Morgan tract

100 acres of land, and no more. It is also apparent from the field notes in the deeds of June 29, 1868, and November 4, 1869, that the location of the tract as above indicated is in accordance with the purpose and intention as expressed in said deeds, and that the true location thereof would be more accurately determined by following course and distance calls than by resorting to any other means. It may be well to here state that the evidence shows that one of the bearing trees called for in the field notes for the northeast corner of the Woodyard-Morgan tract was found upon the ground at a point which corresponds for all practical purposes with the location of said corner by course and distance calls, as above indicated.

It follows, then, that the authorities cited in the opinion on rehearing are inapplicable to the instant case. Such authorities could be applicable only in the event of a retrial, and where the pleadings and proof would show appellee's right to recover for more than 100 acres. Even in that contingency, I seriously doubt the applicability of Maddox v. Fenner, 79 Tex. 279, 15 S. W. 237, and similar cases cited, because the evidence in this case affirmatively shows that the artificial objects called for in the south line of the John Brown Jones survey are not to be found upon the ground, and without them such a line would necessarily be an uncertain line, save and except there be proof to establish the original location of this line with the footsteps of the surveyor who made the original survey. The south line of the Dunman 279½-acre tract corresponds with the south line of the John Brown Jones, which, for the like reason, would also be uncertain, and, for the same reason, the location of the north line of the Dunman 279½-acre tract would necessarily be uncertain. The field notes of the John Brown Jones survey do not call for any adjoining survey, and any reputed, recognized line between the John Brown Jones survey and any adjoining survey, unless it was shown to be a line as originally surveyed for the location of that tract—in other words, shown to be the actual footsteps of the surveyor originally locating the south line of the John Brown Jones—would not be material evidence in establishing the line between Hermann and Thomas, or to establish the north line of the Dunman tract. Before appellant should be bound by any line recognized or acquiesced in by him, such line must first be shown to be the boundary line between the lands as belonging to him and the appellees. His recognition of some line as the south boundary line of the John Brown Jones is not material for any purpose in determining the boundary between him and appellees. This principle of law is well established, and is expressly decided in the case of Bohny v. Petty, 81 Tex. 527, 17 S. W. 80. My attention has been called to no case which holds to the contrary. If, upon retrial, however, the evidence is sufficient to establish the north line of the Dunman 279½-acre tract by finding upon the ground the footsteps of the original surveyor, who made the survey of the selection of the 100 acres for Woodyard and Morgan, and it be found that such line was at a point farther south than 230 varas from the northwest corner as located, then it would necessarily follow that the extreme south line of the tract should be located so as to embrace within boundaries of the Woodyard and Morgan tract 100 acres only. The extreme southern boundary line, however, in either event, to be located upon the ground at a point so as to embrace within the boundaries of the Woodyard and Morgan tract 100 acres only.

For the reasons herein indicated, I concur in the opinion that this case should be reversed and remanded for retrial.