GOODRICH et al. v. WEST LUMBER CO. et al. (No. 13.) *

(Court of Civil Appeals of Texas. Beaumont. Oct. 21, 1915. On Rehearing, Jan. 6, 1916.)

1. BOUNDARIES &⚬=37 — LOCATION OF LINE AND CORNER OF SURVEY — SUFFICIENCY OF EVIDENCE.

In trespass to try title, evidence *held* to show the location of the northwest corner of a certain survey, and that a boundary line should run north 43 degrees east from such corner to the northeast corner of the survey, unless arrested.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 184–194; Dec. Dig. &⚬=37.]

2. EVIDENCE &⚬=460—DESCRIPTION OF LAND—CALL OF SURVEY—CONTROL BY PAROL EVIDENCE.

Where a call in the field notes of a survey makes no reference to objects upon the ground indicating the footsteps of the surveyor, such call cannot be controlled by parol evidence of the existence of such objects, except in actions to correct mistake; but the rule does not apply when the evidence of facts and surrounding circumstances, extraneous to the call, is simply in aid of a call found in the field notes, to remove an ambiguity, and determine which of two or more conflicting calls shall prevail.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2115–2128; Dec. Dig. &⚬=460.]

3. EVIDENCE &⚬=83—DESCRIPTION OF LAND—PRESUMPTION OF MARKING OF CORNER.

It will be presumed that a surveyor marked a corner which his notes state he established on a tree locating it.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 105; Dec. Dig. &⚬=83.]

4. BOUNDARIES &⚬=33—DESCRIPTION OF LAND—EVIDENCE—EXISTENCE OF BEARING TREES—PRESUMPTION.

In trespass to try title, where nothing was shown to arrest the established northwest line of a survey over lands which had been cleared of timber, the presumption was that the bearing trees at the points called for by the field notes were there once, and, even in their absence, the boundaries of the survey would be fixed in accordance with the notes.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 146–152; Dec. Dig. &⚬=33.]

Appeal from District Court, Polk County; L. B. Hightower, Judge.

Trespass to try title by Cornelia G. Goodrich and others against the West Lumber Company and others. From a judgment for defendants, plaintiffs appeal. Reversed, and judgment rendered for plaintiffs.

Crook, Lord, Lawhon & Ney, W. D. Gordon, and Thos. J. Baten, all of Beaumont, and Campbell & Campbell, of Houston, for appellants. Hill & Hill and S. H. German, all of Livingston, and Baker, Botts, Parker & Garwood, of Houston, for appellees.

BROOKE, J. This is a suit in trespass to try title, filed on December 29, 1913, by Cornelia G. Goodrich, Mary W. Montgomery, Margaret M. Montgomery, Edward L. Montgomery, Jr., Helen M. Krasicka, and Jeam Krasicka, as plaintiffs, against the West Lumber Company, P. R. Roe, J. W. Cochran & Co., J. W. Cochran, Alice Cochran, W. B. Cochran, and Arthur L. Blessing, as defendants. The suit was for the recovery of four leagues of land in Polk county, granted to Augustine Viesca by the government of Coahuila and Texas in 1833, and for the value of timber cut by defendants on a portion of said four leagues of land alleged to contain 2,027 acres, more or less. The land sued for is described as follows:

Situated in the county of Polk and said state of Texas, on the east bank of Trinity river, beginning on said bank of said river above the old Coashatta Indian village at pecan 14 inches in diameter, and it stands on a line 200 varas from the bank of the river Trinity, and is to the north 23 degrees east 3 varas from another pecan 18 inches in diameter, and to the north 62 degrees west 4½ varas from a hackberry 24 inches diameter, and to the south 71 degrees west 1 vara from another hackberry 9 inches diameter, and also marked an elm 12 inches diameter, and it stands to the north 68 degrees west 100 varas from the above described corner, being the first landmark; thence north 43 degrees east 15,833 varas to a white oak 15 inches diameter, and it stands to the north 16 degrees west 4 varas from another white oak, and to the north 5 degrees east 3 varas from an ash 12 inches in diameter, and to the south 76 degrees east 9 varas from a white oak 15 inches diameter, being the second landmark; thence south 47 degrees east 7,500 varas to an oak 4 inches in diameter, being to the north 84 degrees east 11 varas from another oak 12 inches in diameter, and to the north 84 degrees west 10 varas from another oak 9 inches in diameter, being the third landmark; thence south 43 degrees west 10,830 varas to an ash 4 inches in diameter on the east margin of the aforesaid river, and it extends to the north 63 degrees west 7½ varas from a sycamore 36 inches in diameter, and to the north 20 degrees 31 minutes west 16 varas distant from a sugar tree 14 inches in diameter, and to the north 21 degrees 30 minutes west at 24 varas distance from an elm 24 inches in diameter, and also stands to the north 68 degrees east 13 varas

---

from a sycamore 24 inches in diameter, being the north and last landmark of this survey; and thence following the meanders of the aforesaid river up to the beginning point, containing four leagues of land, or an area of 100,000,-000 square varas, and being part and parcel of eleven leagues of land granted to Augustine Viesca by the government of Coahuila and Texas.

Upon the trial the plaintiffs in open court dismissed their suit as to the defendant Arthur L. Blessing. There was also filed the following agreement:

"It is agreed that this is a boundary case, involving the true location of the lines of what is known as the A. Viesca four-league grant, situated in Polk county, Tex. The plaintiffs assert no claim to any part of this grant lying west or southwest of the line described as follows: Beginning at the southeast corner of J. S. Garner league, in Polk county, Tex., the same being also the southeast corner of a 38-acre tract of land owned by the defendant West Lumber Company out of said Garner league; thence north 49 degrees west with the east line of said Garner league 2,400 varas to the most northern corner of said Garner league; thence south 41 degrees west with the said Garner upper line 385 varas to the southeast corner of a 100-acre survey owned by the defendant West Lumber Company, known as the C. D. Martin survey; thence north 47 degrees west, at 1,128 varas across the Livingston and Patrick Ferry road, 1,979 varas Tempe creek, 2,300 varas Tempe creek, about 5,093 varas in all, to a stake in which a red oak bears south 10 degrees west 3 varas, a pine stump 36 inches in diameter bears south 81 degrees east 4.3 varas marked X; thence south 43 degrees west 765 varas to the north corner of a 75-acre survey, made for Mrs. Sarah M. Smith, a stake from which a 16-inch sweet gum bears south 60 degrees west 9 varas, a pine 8 inches in diameter bears north 86 degrees east 10 varas; thence north 47 degrees west to the upper line of said Viesca four-league grant, wherever the same may be located.

"The plaintiffs own all of said Viesca four-league grant, if any, lying east and north and northeast of the line above described. The defendants own all of said Viesca survey lying west or southwest of the above-described line. The defendants, in addition, own the following surveys, all of which is junior in point of location to the A. Viesca four-league grant, and defendants' title to said surveys is junior to any part of said land found to be within the boundaries of A. Viesca four-league grant; said surveys of land being as follows: Geo. W. Miles, one-third of a league; D. W. Smith, one-third of a league; Wm. White, one-third of a league; W. C. Hicks survey of 640 acres, which survey contains 522½ acres, patented to L. C. McMicken, assignee of Buffalo Bayou, Brazos & Colorado Railway Company; I. F. Haynes 160-acre survey, 316¾ acres patented to L. S. McMicken, assignee of Buffalo Bayou, Brazos & Colorado Railway Company; survey of 68.43 acres patented to P. R. Rowe.

"This agreement is made without prejudice to the questions of limitation pleaded by the defendants, or any questions of warranty that may be involved in this case."

During the progress of the trial the following agreement was entered of record:

"It is agreed by and between the plaintiffs and defendants J. W. Cochran & Co., J. W. Cochran, W. B. Cochran, Alice Cochran, and P. R. Roe that judgment shall be entered in the above entitled and numbered cause that these defendants have judgment for the lands described in their respective answers, except the 50 acres in the most eastern corner of the Buffalo Bayou, Brazos & Colorado Railway Company survey of 316¼ acres, which 50 acres was conveyed by the defendants J. W. Cochran & Co., J. W. Cochran, W. B. Cochran, and Alice Cochran to Mrs. Emmeline D. Taylor and M. M. French by deed dated October 10, 1903, and which is of record in Volume 21, pages 522 to 524, of the Deed Records of Polk county, Tex., and it is further agreed that these defendants recover of plaintiffs all costs incurred by reason of their being made parties herein. This December 16, 1914."

There was some controversy, real or apparent, as to the beginning corner of the four-league grant, and also apparent dispute as to the location of the first line called for in the grant, which was the north line, or northwest line, running from the river out to what is referred to in this record as the "holly corner." All of the corner trees and bearing trees have disappeared. It was the contention of the plaintiffs that such corner trees and bearing trees should be presumed to have been located at the distances called for in the grant. The field notes of the original grant called for the north line running north 43 degrees east 15,833 varas from the pecan, which is a line and bearing tree at beginning corner, to a white oak 15 inches in diameter standing to the north 16 degrees west 4 varas from another white oak, and to the north 5 degrees east 3 varas from an ash 12 inches in diameter, and from a white oak to the south 76 degrees east 9 varas 15 inches in diameter, the second landmark. But the defendants contend that said corner was not in fact located at 15,833 varas from said bearing tree, but at 14,670 varas from the place of beginning, and at a place called in this record the "holly corner." The defendants introduced evidence of an old marked line running off from the point referred to in the record as the "holly corner," and running south 47 degrees east from said place, and they relied upon this, among other things, to arrest the call for distance as given in the original grant, and assert that the old line referred to was the east line of the original grant. The plaintiffs contend that the four leagues should be located according to course and distance called for in the original grant. If the four-league grant should be located by course and distance called for in the original field notes, the plaintiffs would be entitled to recover against the defendant West Lumber Company all of the junior survey, Buffalo Bayou, Brazos & Colorado Railway Company, comprising 522½ acres; also all of the Isaac F. Haynes, Jr., survey, comprising 160 acres; also the G. W. Smith, Jr., survey of 170 acres; also the Wm. White survey of 163.8 acres, and the W. C. Hicks, Jr., survey of 105 acres, and the G. W. Miles survey of 34 acres.

The following sketch shows the location of the land and the extent and amount of each junior survey in conflict with the Viesca four-league grant, when located according to course and distance called for:

The case was submitted to the jury by general charge of the court, special issues not having been requested, and the jury returned a verdict for the defendant West Lumber Company, and judgment was entered thereon that the West Lumber Company recover against the plaintiffs all of the land in controversy and that the plaintiffs recover nothing by their suit. Plaintiffs duly excepted to the charge of the court in many particulars, presented their special charges, and timely filed their motion for new trial, pointing out errors which they say were committed upon the trial of the case, and which said motion for new trial was by the court overruled. Plaintiffs duly excepted to said action of the court, perfected their appeal, and the case is now before us for disposition.

Our first inquiry will be whether it is shown there is a real dispute with reference to the location of the beginning corner, and with reference also to the north or northwest line of this league. There are no bearing trees to be found now standing where the appellants claim the beginning corner of this grant to be. Appellants say that the beginning corner should be and is on the bank of the river and in what is known as the Scarborough field, which said field is cleared and cultivated, and continues along the line of what appellants claim is the north line of this grant, for a distance of about 2,000 varas, and in all of that distance it being (as said) through cleared and cultivated land, and there are no objects on the ground to identify the place where appellants claim said north line to be. Appellants say that they have established the beginning corner of this grant and the northwest line of same by the uncontroverted evidence submitted on the trial, and by the admissions of appellees in their pleadings in court below, and cite us to the following testimony produced upon the trial of this case in support of their contention:

They say that appellees in their second amended original answer and cross-bill used the following language:

"The Minter northwest line, as shown by the Minter plat, is the northwest line of the A. Viesca four-league grant, and well marked on the ground."

They say, further, that the Minter plat introduced by appellees fixes the beginning corner on the Trinity river, and the northwest line of the Viesca grant precisely as claimed by the appellants in this suit; the only difference being that Minter stopped at what is designated the "holly corner." It is claimed that the West Lumber Company, appellee herein, holds directly under Wm. Carlisle & Co., and that Wm. Carlisle & Co. hold directly under the appellants in this suit by their deed a large portion of this Viesca grant, and that in this deed, under which the West Lumber Company, appellee, claims title, the same boundary lines are called for as contended by appellants; that in said field notes the northwest boundary line of said Viesca grant is called for, and that the next call starts south 43 degrees west with the said Viesca line 521 varas to the corner made for I. Jackson. The appellants also contend that in the West Lumber Company's answer it is alleged as follows:

"Defendant further alleges that the lands owned by defendant West Lumber Company are described by reference, first, as all the lands described in the deed of Cornelia G. Goodrich and others, and that by the allegations then made this deed was intended to and did convey to Wm. Carlisle & Co. all of the lands at that time owned by the grantor on the Viesca four-league grant, whether expressed in said deed or not, and that all of the lands on the Viesca four-league grant owned by the plaintiffs in this suit, or by any other through whom they claim, as shown by the plat made by Civil Engineer Minter for Wm. M. Goodrich, deceased, for plaintiffs in this suit, or those under whom they claim."

And it was also alleged by the appellees that these identical lands described by metes and bounds in the Goodrich deed to Carlisle had by deed been conveyed by the Goodrich heirs, and that the defendant in this suit was the owner of said land. Thus appellants contend that the West Lumber Company affirmatively pleaded the boundary lines of the Viesca grant, and its location precisely as claimed by the appellants, the only difference being as to whether the Goodrich heirs did convey all of their land in the Viesca grant, and that if the line running out from the river north 43 degrees east is required to be stopped at what is known as the "holly corner," instead of going to its full limit, then the plaintiffs had conveyed their land to the defendant through the deed to Carlisle & Co. The appellants claimed further that the contention resolved itself into a question, not where the Viesca grant lay, and not where its northwest boundary line actually was, and not where its beginning corner on the river was, for they claimed that these were admitted in the pleadings, and were undisputed by any litigant in the case; but they say that the question raised and the issue litigated was whether that line from the Trinity river north 43 degrees east should run out its complement or stop at what is known as the "holly corner," and they refer to the agreement which has been heretofore set out in support of their contention.

Appellants further say: That, in addition to the allegations of the West Lumber Company's answer to the suit above set out, there were a number of exhibits describing by metes and bounds certain surveys of land upon and adjacent to the Viesca grant, and calling for its boundary lines. That the West Lumber Company alleged that it claimed under the boundary specified in these exhibits. That Exhibit C, in describing the Beasley land, and the Garner conflicting survey with the Viesca, expressly says:

"The above two tracts of land set aside to F. A. Garner and others by decree of the United States Circuit Court at Galveston in cause 1003, Wm. M. Goodrich, Deceased, Revived in the Name of Cornelia G. Goodrich, Executrix, v. F. A. Garner and Others."

And Exhibit J reads:

"Part of the four-league grant of Augustine Viesca eleven-league grant"

—then describing the beginning corner to be on the east bank of the Trinity river, between the Goodrich and Garner surveys. And they claim that said Exhibit J expressly calls for and identifies the northwest boundary line of the said Viesca grant, and that the beginning corner on the river is in Scarborough's field, that Scarborough got his deed from a man named Poitevent in 1892, and that the first descriptive call is:

"Also one other tract from off the A. Viesca tract, situated in Polk county, Texas, beginning at the northwest corner of said grant, on the east bank of the Trinity river, thence north 43 degrees east with the northwest line of said grant," etc.

—and that Poitevent got this land from Goodrich in 1876, and the first call is:

"Beginning at the northwest corner of the four-league section of the said Viesca eleven-league grant," etc.

We confess that the contention of appellants seems to be borne out by the record, and in addition thereto the testimony of J. W. Cochran, one of the appellants' witnesses, only a part of the same being set out, is as follows:

"I own a part of the A. Viesca four-league grant. I own a part of the Scarborough, Jennings tract, George Davis tract, as I call it, and a part of the Garner. Mr. Scarborough is the man who bought it about 40 years ago from Mr. Poitevent, and he lived on this land until he died, 3 or 4 years ago. He stayed there somewhere about 35 to 40 years. Mr. Scarborough bought that land from June Poitevent. This north line of the Viesca is supposed to run through the Scarborough field some place, and that north line crosses Mill Lake bayou somewhere northeast of my farm. Mill Lake bayou is about 2,000 varas, possibly more, northeast of the river there. It is 2,000 varas from the river to where the north line of this land crosses Mill Lake bayou, and that north line has the old bearing trees on it. As to whether that old line I am talking about comes right through there: Well, the line I told you had the blazes on it comes through the field, or near the field. As to whether it comes down and corners on the river: Well, I don't know where it comes to; if it come down to the bend, and strikes the river about Geneva bend, it would. If it didn't change its course, it would strike the river at or near Geneva bend. It would go through the Scarborough field. I guess it will cross Mill Lake bayou about 2,000 varas, or possibly more, from the river. I have followed this line out as far as my land goes, and it goes to Mill Lake."

L. F. Sloan's testimony was as follows: That he and one of defendants' witnesses named Garvey went on the land to locate the lines, and they found the northwest line of the Viesca, and ran it according to course and distance called for in the field notes back from what is called the "holly corner" to the river. And Sloan says he found the usual marks that are marked in the woods on old land lines, and they were old marks. Continuing he said:

"I continued that course until I arrived at the river. After crossing Mill Lake bayou we went to Mr. Scarborough's field, and, of course, there was no line there, as that was all cleared land. Mr. Scarborough was living there—that is, just outside the four-league grant—and the line went through his field, and he was cultivating both sides of this line."

Continuing he says:

"I went right through the Scarborough field, which was cultivated land, and wound up at the bank of the river. My recollection is there was a tree we found there at that time with an X on it; I think it was a pecan tree. It was, as I recall, just over the edge of the bank, about stood say 5 or 6 feet lower—that is, the ground at the tree 5 or 6 feet lower—from the top of the bank. I should say it was about 25 or 30 feet from the water's edge. Of course, now, we did not make any measurements, or anything of that sort. Mr. Scarborough was living there —that is, just outside of the four-league grant— and the line went through his field, and he was cultivating both sides of that line. I don't recollect whether he claimed to be the owner of the land, but it was known as the Scarborough field."

Continuing he says:

"At that time, when I was there with Mr. Garvey [one of the defendants' witnesses], and with Mr. Scarborough, and showed Mr. Scarborough where this line, the point where the line, strikes the bank of the river, Mr. Scarborough said that when he came to that place, which as I remember had been some 20 years ago, the tree called for in the field notes—is the way he put it, and the way we understood it— stood there on the bank of the river, at that point; but the tree that was this tree he referred to had fallen down, was gone, but I think there was a mark there of some sort, as I remember."

The testimony of Mr. Sloan and Mr. Garvey shows that from this point they traced out the Viesca line according to calls and distance, finding on the said course the old marks of the line. Mr. Garvey, appellees' witness, recounted the work done by him when he located these lines in 1900 for Wm. Carlisle & Co., who were then trading for the Goodrich land, and Mr. Garvey uses the following language:

"In 1900 I followed this line that I took to be, and that I now swear is, the original line of the Viesca grant on the northwest, and I traced that line out from the river 14,400 and some odd varas."

Dave Green, another witness for appellees, testified that he was with Garvey in 1900 when he ran the line from the river out to what is called the "holly corner." He said:

"I followed the line north 43 degrees east from down about Elbert Smith's place up to the holly corner. We followed the line from the bank of the river up to that tree."

Mr. Cochran, one of appellees' witnesses, testified that he had known the Scarborough place ever since he could recollect, and that he could safely say for 40 years; that there had been no appreciable change as to the river at the Scarborough house, but below the house there has been a considerable change.

"There is a high bend there, and there has been no change for the 35 or 40 years since I have known it. Where this Viesca line strikes the river, there has been no great change since I have known it."

A great many maps have been submitted to the court from the land office, and these maps show the location of the Viesca grant, and its relative position with reference to the river from the year 1841 down to the present time, and they locate the northwest line as being at the place contended for by the appellants; that is, these maps all show the location of said northwest line up to what is known as the "holly corner," and many of them show a continuation of the line from the holly corner. Mr. Omohundro, a civil engineer, after having testified that he went to all four corners, and went to the four places in doing his work down there and seeking to run the lines of the Viesca survey, testified that at none of those four points did he find a single tree that is called for in the grant. He says he did not find a single object on the ground—that is, at the place where these corners were called to be—by which this grant could be identified. The only thing that is called for in the grant, with reference to said corners, was the Trinity river. He then further testified that two of these corners were in an old field, one on the river at the northwest corner (the beginning point), and the other on the south line in the southeast corner. Both of these were in an old field. He further said that the timber had been cut all through that country and around where he would expect to find the northeast corner. He further testified that in that section of East Texas, in dealing with surveys in reference to Mexican grants made in the '30's, only a very few of the original bearing trees from his experience could be found. He further testified that he ran the line out from the corner on the river north 43 degrees east and—

"I found old Mexican ground marks fore and aft. Well, I found one, or two, or three, perhaps, that I judged to be the old lines, the oldest that I saw anywhere else in this country."

Summarizing, appellants claim that they have established the northwest corner of the Viesca grant and the northwest line of the same by the admissions of the appellee in its pleadings, by the calls for the line in repeated conveyances, by the oath of Mr. Garvey, appellees' witness, who positively swore that it is the line of the Viesca grant, by the original marks on the line found by Garvey, by Green, and by Cochran, witnesses for appellees, and by Sloan and Omohundro, by the records of the general land office from the earliest time to the present time, and by the identification of the spot where Scarborough said the original pecan tree stood when he first acquired the land.

[1] We have burdened this record with copious extracts from the testimony of the various witnesses, and used and adopted the argument in appellants' brief, for the purpose of demonstrating whether or not there is a *real* dispute between the plaintiffs and defendants as to the point of beginning and of the northwest line of this grant, up to what is known as the "holly corner." There is no testimony in the record which discloses any fact which would lead us to believe that the beginning corner of said league and the location of the north or northwest boundary line of the league was and is not now at the place where the appellants contend same to be; that is to say, that the north or northwest line runs up to what is known as the "holly corner," and in our judgment all of the testimony which is available does show, or tend to show, that the line began at a point on the river, the pecan being on the line, at a point 200 varas from the Trinity river, and that said tree was within the field of Mr. Scarborough, who is now dead, and said pecan tree was standing at the place called for in the grant, but has since fallen down, and is not now to be found. Therefore we conclude that this record discloses testimony which shows conclusively to our mind that said northwest corner of the Viesca league should begin at the point in Scarborough's field on the bank of the Trinity river, and that a pecan tree formerly stood in the line which was called for in the field notes of the original surveyor, and that said line should be run north 43 degrees east; as is found upon the ground by old marks upon trees after you pass Mill's Lake and out of the clearing of Scarborough, continuing to the northeast corner of said survey its complement of varas, if not arrested.

The settlement of this question removes many difficulties in the further adjudication of this case, for after we have a definite beginning point, and have a definite north or northwest line running in a definite direction, it only remains to be decided whether or not this line should run to its complement of varas, or whether it was arrested before it reached 15,833 varas.

It is earnestly contended by the appellees, and with apparent force, that if the beginning point be fixed as above decided, and if the northwest line be fixed as above, there was sufficient testimony upon the trial of this case to arrest the call for distance in said grant, and they say that said northwest line, when it reached what is known as the "holly corner," intersected an old marked line running south 47 degrees east, and they claim that this line is the east boundary line of the Viesca grant, and they, in support of their contention, introduced a great mass of testimony with reference to what they refer to as the "holly corner," and the old line running south 47 degrees east approximately 5,200 varas. In this connection it is not disputed that the original field notes do not at the northeast corner of the grant call either for a holly or for any of the trees near what

is known as the "holly corner," with one apparent exception—that is, as to their distance and kind, and variation—but that all the marked trees at what is known as the "holly corner" are absent from the calls of the original field notes, as set out for the said northeast corner.

There is, without question, an old marked line running from what is known as the "holly corner," and designated on the map as "A," and that this line is identified with reasonable certainty to have been made many years ago, probably nearly as old, some of the marks showing as much as 50 years ago; that is to say, there are a few marks on this old line, shown to have been marked on the trees, showing that the same were made many years ago, but this old line only runs from what is called the "holly corner" 5,190 varas to a place known to be and called the Beasley southeast corner, and south of what is known as the Beasley corner there is no mark or evidence of any old line to show that any line was ever traced thereto. The calls in the original field notes from the northeast corner of the grant call to run south 47 degrees east 7,500 varas. Therefore, if this old line, as contended for by appellees, is the east line of the Viesca survey, it is 2,310 varas short. Also it may be remarked in this connection that what is known as the Beasley corner does not correspond in any way with the southeast corner called for in the original field notes of the Viesca grant, either as to trees, or marks, or anything that would so identify it. What is known as the "holly corner," and this old line running south 47 degrees east, are relied upon by appellees to arrest the calls for distance of the northwest line of this survey. There is found upon said holly the name "A. Viesca," but the testimony shows that this mark or name was and is of comparatively recent date. The marks on the holly tree do not correspond with anything called for as identifying the northeast corner of the league. It is believed that the holly corner was made by a surveyor, Minter, in platting a portion of a block of land surveyed by him. The Mary Smith survey was originally located on the ground where the two Buffalo Bayou, Brazos & Colorado and I. F. Haynes are situated on the map. The Smith location was floated, and the Barco afterwards placed on it, and that was also floated and the locations as shown on the map were then made. It may be said that the Mary Smith was located in 1838, and its field notes call for the Beasley southeast corner. We append to and make a part of this record the map made by Minter of his survey, perhaps made in the year 1873.

[2] This brings us to the question as to what are the rules of law that should be applied to the facts of this case in determining the issue of boundary. It seems by the decisions of our courts that lines and boundaries cannot be construed with reference to objects that may be found upon the ground, as indicating the footsteps of the surveyor when there are no calls in the grant for such objects. A brief review of the decisions will therefore be made.

In the case of Railway Co. v. Anderson, 36 Tex. Civ. App. 121, 81 S. W. 781, the court says:

"The descriptive matter offered in evidence by the appellant, and which is relied upon to control the express description stated in the deed, is not, by the terms of the right of way deed, called for as a matter of description, or as a part of the field notes tending to identify the land. The contention is that the footsteps of the surveyor who located the right of way could be found at places other than that called for in the descriptive matter contained in the deed, and to go to this point would extend the right of way some distance further north than 25 feet from the center of the track. The difficulty that lies in the way of supporting this contention is that the objects sought to be established by the appellant as found upon the ground, as indicating the boundaries of the right of way according to its theory, are not called for in the field

COPY OF MINTER PLAT OF A. VIESCA 4 LEAGUES.

notes of the deed under which it holds; and in cases of this character the rule seems to be well established that lines and boundaries cannot be construed with reference to objects that may be found upon the ground as indicating the footsteps of the surveyor, when there are no calls in the grant for such objects. Hamilton v. Blackburn, 43 Tex. Civ. App. 153, 95 S. W. 1094; Anderson v. Stamps, 19 Tex. 460; Ratliff v. Burleson, 7 Tex. Civ. App. 624, 25 S. W. 983, 26 S. W. 1004, and cases there cited."

In Sloan v. King, 33 Tex. Civ. App. 537, 77 S. W. 48, it was said:

"Anderson v. Stamps, supra, Rest v. Donald, 19 S. W. 795, and Coleman County v. Stewart, 65 S. W. 385, and like cases, announce the correct doctrine that the call in the field notes of a survey cannot be controlled by parol evidence of the existence of objects which are not called for, that the boundaries are to ·be determined and extended from some of the calls of the grant, and that parol evidence, except in actions to correct mistake, is not admissible to correct a call. But this rule does not apply when the evidence of extraneous facts and surrounding circumstances is simply in aid of a call found in the field notes, when the purpose is by such evidence to remove an ambiguity, and to determine which of two or more conflicting calls shall prevail. This is made apparent in the case of Booth v. Upshur, 26 Tex. 71, and Duren v. Presberry, 25 Tex. 517, where, in each case, Anderson v. Stamps is explained. The uncertainty or ambiguity in the calls of the deed from Thaxton to King and from Thaxton to Hoover did not arise upon the face of these instruments, but arises when the effort is made to apply them to the land intended to be conveyed. In applying the calls contained in these deeds, it is found that the call for the northeast corner of survey No. 64 conflicts with the call for course and distance 975 varas north 57 degrees east from the known corner 200 varas from the river. The jury adopted the last call as the correct and controlling one, acting evidently upon the theory that the call for the northeast corner of survey No. 64 was a mistake, and we have no doubt as to the correctness of this conclusion. There is no evidence, as said before, that Thaxton, in locating and surveying the land intended to be surveyed, ever ran the line from the corner 200 varas from the river on the course north 40 degrees east to the northeast corner of survey No. 64, and there established a corner as contended for by appellant; but there is evidence to the effect that from the corner 200 varas from the river he ran a line and marked the same on the course north 57 degrees east, and established a corner on the east line of survey No. 64, and, such being the case, we have evidence of his footsteps which is consistent with the call in the grant, and which may be considered as evidence identifying this call, and giving to it a superiority over the call for the northeast corner of survey No. 64. Oliver v. Mahoney, 61 Tex. 612."

In the case of Johnson v. Archibald, 78 Tex. 102, 14 S. W. 266, 22 Am. St. Rep. 27, the court uses this language:

"If the calls in a grant, when applied to the land, correspond with each other, parol evidence is not admissible to vary them by showing that in point of fact they are not the calls of the survey as actually made. But if, when so applied, they disclose a latent ambiguity—that is to say, if they conflict with each other—then extrinsic evidence may be resorted to in order to determine the conflict and show the land actually intended to be embraced by the calls of the survey. Certain calls, such as for natural objects, marked lines, and corners, being less likely the result of mistake, in the absence of other evidence, prevail over calls for course and distance; but the survey actually made is in legal

contemplation the true survey, and is always competent to show by any legal evidence where the lines were in fact run upon the ground. It follows, therefore, that whenever the evidence is sufficient to induce the belief that the mistake is in the call for natural or artificial objects, and not in the call for course or distance, the latter will prevail, and the former will be disregarded."

We find this doctrine recognized in Gregg v. Hill, 82 Tex. 405, 17 S. W. 838; Booth v. Upshur, 26 Tex. 65; Boon v. Hunter, 62 Tex. 588; Duff v. Moore, 68 Tex. 270, 4 S. W. 530; Lilly v. Blum, 70 Tex. 710, 6 S. W. 279; Oliver v. Mahoney, 61 Tex. 612; Jones v. Andrews, 62 Tex. 652; Jones v. Burgett, 46 Tex. 291; Shelton v. Bone, 6 S. W. 225; Busk v. Manghum, 14 Tex. Civ. App. 621, 37 S. W. 459; Castleman v. Pouton, 51 Tex. 87; Hubert v. Bartlett's Heirs, 9 Tex. 103; Bigham v. McDowell, 69 Tex. 106, 7 S. W. 315; Colonization Co. v. Flippen, 29 S. W. 813; Arambula v. Sullivan, 80 Tex. 615, 16 S. W. 436; Green v. Barnes, 9 Tex. Civ. App. 660, 29 S. W. 547.

In the case of Sloan v. King, supra, continuing, the court said:

"In many of the cases cited course and distance was made to prevail over objects found upon the ground, as called for in the field notes. This upon the theory, as so frequently stated in some of the cases, that when the facts and surrounding circumstances indicate that course and distance is the most reliable of the two calls, and that the call for the object was by a mistake, the latter will be made to yield to the former."

In Hamilton v. Blackburn, 43 Tex. Civ. App. 162, 95 S. W. 1098, it is said:

"There being no evidence of any uncertainty or ambiguity in the calls of· the chalk deed, it was not proper to consider, in establishing the south line of that survey, anything found on the ground that was not called for in the deed, as indicating the actual footsteps of the surveyor. In such a case his work must be tested by the actual calls of the grant, and under the authorities cited, and in view of the rule there stated, we are clearly of the opinion that there is no evidence in this record controlling the call in the Chalk deed for course and distance south of the Polk survey, and that the verdict of the jury to the contrary was not supported by the evidence, and the court should not have submitted that issue to the jury."

In the case of Brodbent v. Carper, supra,· the court says:

"It is held that, where the deed calls for certain well known and established objects, such calls will not be controlled by objects found upon the ground as indicating the footsteps of the surveyor, * * * when not called for in the deed."

In the case of Guill v. O'Bryan, 121 S. W. 593, which is somewhat like the instant case —that is to say, the suit was brought in ordinary form of trespass to try title, but by agreement of the parties the controversy was made to depend on the true location of a certain boundary line, and the case became one of boundary strictly, as in this case— the Sixth Court of Civil Appeals, speaking through Judge Levy, in the course of the opinion in that case, says:

"It is a settled rule of law, in determining the true dividing line between surveys, as in this case, that if *from a definite beginning point*

(italics ours) course and distance alone will with reasonable certainty locate and identify the line, as in this case, that will be held sufficient. Course and distance will control, then, under the surrounding and connecting circumstances. They are the most certain and reliable evidences of the true locality of the grant [citing Robinson v. Doss, 53 Tex. 506]. Where no marked trees are on the ground identified by the evidence as those of the grant, as in this case, the true boundary must be ascertained by course and distance given in the patent [citing Luckett v. Scruggs, 73 Tex. 519, 11 S. W. 529]. Where a survey has been made calling for the southwest corner and northwest corner of a patented survey, as in this case, the west and north lines of the latter survey must be run according to the courses and distances laid down in the original field notes, and cannot be varied in order to *reach trees which cannot be clearly identified as the original corner, as in this case* (italics ours)" —citing Williams v. Beckham, 6 Tex. Civ. App. 739, 26 S. W. 652.

Without unduly prolonging the citation of authorities, we will refer to the case of Keystone Mills Company v. Peach River Lumber Company, 96 S. W. 64, in which a boundary question was under consideration. The court says:

"At the southeast corner of the Hinch the trees called for by its surveyor were two pine trees marked H. This witness saw no pine trees there, only gum and oak, and he saw no trees marked H. It is very plain that the testimony of this witness did not identify the southeast corner of the Hinch survey at this place by anything he saw there *as conforming with* the description given for that corner by the surveyor who made the Hinch corners. His testimony is equally imperfect in identifying the bearing trees called for to witness the southwest corner of the Hinch. He says he saw these original trees standing on the north line of the Beach survey. He says they were also blown down in the storm of 1875, that their remains are still lying there, and that he pointed them out to Luttrell. But he testified that these trees were red oaks, while the surveyor designated them as a black oak and a white oak. The witness also testified they were marked by hacks, such as surveyors give (three hacks, the witness believed), and by hacks only. This falls short of what can be called an identification of the witness trees as described in the field notes. This witness testified to the general reputation of the line he was testifying to as being the north line of the Walker county school land. His testimony was not such as would authorize the Hinch lines to be stopped short of their distance at the points he described. The testimony of Surveyor Luttrell is no better in this respect than that of Duke. His work in connection with these surveys appears to have been done in preparation for this trial, and all he knew concerning the identity of the bearing trees spoken of he obtained from Mr. Duke. The testimony of neither of these witnesses was sufficient to locate the Hinch bearing trees; consequently it affords no reason in law or in fact for stopping the Hinch east and west lines short of the distance they called for. * * * The proof was that the call for distance for the south line of the Hinch makes it include the land in controversy, as against the adjoining junior survey. There being in our judgment no evidence that could have had the effect of identifying the said bearing trees called for in the Hinch, there was nothing to limit the force and effect of the call for distance in fixing its south line. We are therefore led to the conclusion that plaintiff's proof was insufficient and that judgment should have been rendered for defendant."

[3] It is urged by the appellants, and with reason, that this four-league grant was the first survey made in this section of the country, and that the other surveys in that vicinity are junior to it, and that no cause existed for the Mexican surveyor to make the survey short, and that, if the point designated in the record as the "holly corner" should be taken as the true northeast corner of the four leagues, the north line will be shortened 1,363 varas, and an area of land 7,500 varas long by 1,363 varas wide will be excluded from the field notes as given in the original grant. The Mexican surveyor says that he ran north 43 degrees east 15,833 varas from a line tree, which he says stood 200 varas from the bank of the Trinity river, and that he established the second landmark on a white oak standing to the north 16 degrees west 4 varas from another white oak, and to the north 5 degrees east 3 varas from an ash, and to the south 76 degrees east 9 varas from another white oak. We believe that it should be presumed that the surveyor marked this corner. Harkrider v. Gaut, 167 S. W. 164; Thatcher v. Matthews, 101 Tex. 122, 105 S. W. 317.

[4] Without the landmarks and bearing trees called for in the original grant can be found at a different point, we believe that the first line must be extended 16,033 varas from the beginning point at the river, and 15,833 varas from the pecan tree, shown now to have disappeared, which was 200 varas from the Trinity river. To our minds, nothing has been shown of sufficient gravity to arrest the distance. No tree has been found, or bearing tree, called for in the original field notes. The surveyor does not say that any line was marked, but the contention is made that the old line found running south 47 degrees east is the east boundary line of the grant. The objection to this, and we think that same is conclusive, is that to accept this old line does not satisfy the quantity of land, that the length of the line is not satisfied, that no landmark referred to by the original surveyor can be found, and that in addition this old line, claimed to be the eastern boundary line of the grant, is found to extend only about two-thirds of the way across the four-league grant, or to about the Beasley corner, and cannot be found running any further south, although its course, as testified to, runs through virgin timber.

The appellees' surveyor, Garvey, admits that the holly tree, standing at the point designated as "holly corner," does not stand at the corner as made at the second landmark by the original surveyor, and he says that the words "A. Viesca" appearing on said tree were put there at a comparatively recent date, at least, not cut in the tree by the original surveyor, and he thinks that the marking was probably done by Surveyor Minter. From what has been said, we deem it

unnecessary to quote further from the authorities, but refer to the following in support of our views, and in support of the propositions above announced: Anderson v. Stamps, 19 Tex. 4C0; Browning v. Atkinson, 37 Tex. 633; Bigham v. McDowell, 69 Tex. 100, 7 S. W. 315; Jones v. Andrews, 72 Tex. 5, 9 S. W. 170; Sanborn v. Gunter, 84 Tex. 273, 17 S. W. 117, 20 S. W. 72; Reast v. Donald, 84 Tex. 653, 19 S. W. 795; Blackwell v. Coleman, 94 Tex. 216, 59 S. W. 530; Fagan v. Stoner, 67 Tex. 286, 3 S. W. 44; Ratliff v. Burleson, 7 Tex. Civ. App. 621, 25 S. W. 983, 26 S. W. 1003; Sloan v. King, 33 Tex. Civ. App. 537, 77 S. W. 48; M., K. & T. Ry. Co. of Texas v. Anderson, 36 Tex. Civ. App. 121, 81 S. W. 781; Hamilton v. Blackburn, 43 Tex. Civ. App. 153, 95 S. W. 1094; Keystone Mills Co. v. Peach River Lbr. Co., 96 S. W. 64; Brodbent v. Carper, 100 S. W. 183; Guill v. O'Bryan, 121 S. W. 593; Runkle v. Smith, 133 S. W. 745; Hermann v. Thomas, 168 S. W. 1037.

Therefore we are pursuaded to believe, nothing having been shown to arrest or stop the north or northwest line of this grant, shown to definitely begin at the river and continuing by a pecan 200 varas from the bank of the Trinity river, that the line should from said point at the pecan tree have run 15,833 varas to its northeastern corner, and, no bearing trees being found there now, they are presumed to have been there; that the line then runs south 47 degrees east 7,500 varas to the southeastern corner of the grant, and, no bearing trees being found on the ground now corresponding with those of the grant, the same will be presumed to have been at that point; and thence running south 43 degrees west to the bank of the Trinity river, and thence with the river to the beginning point; and thus we fix the boundaries of this grant.

What has been said above disposes of the case, as we see no reason under the facts to return this case to the trial court for a new trial. In view of the decision and the disposition made of the case, we have not discussed the many propositions raised by appellants with reference to the introduction of testimony, and the action of the trial court in admitting and excluding said matters, as the same is unnecessary.

There seems to be no dispute about either the amount of the timber cut or the value of the same. Therefore, after fixing the boundaries of the grant as above stated, we here render judgment reversing and rendering this cause in favor of appellants, and awarding judgment against the appellees, in favor of appellants, for 10,313,000 feet of timber, at $3 per thousand feet, making an aggregate of $30,936.

Judgment is rendered accordingly.

## On Rehearing.

A correction is desired to be made in the opinion heretofore handed down in this case, on page 20 of said opinion (182 S. W. 350). The court was made to say in the opinion as follows:

"In view of the decision and disposition made of the case, we have not discussed the many propositions raised by appellants with reference to the introduction of testimony and the action of the trial court in admitting and excluding said matters."

It should read:

"The many propositions raised by appellants with reference to special charges and the action of the trial court in admitting and excluding said matters."

A further correction is made in the description of the land on the first page of the opinion (182 S. W. 341) where it is made to say:

"Beginning on said bank of said river above the old Coashatta Indian village *at* pecan."

It should be "*a* pecan."

We desire also to reform the opinion originally handed down in this case in this respect: That the judgment in the case should be that the north or northwest line of the grant should begin on the bank of the Trinity river and continue by a pecan 200 varas from the bank of the Trinity river; from thence run north 43 degrees east 15,833 varas to its northeast corner, and that the line shall run thence south 47 degrees east 7,500 varas to the southeastern corner of the grant, and thence running south 43 degrees west to the bank of the Trinity river, and thence with the said Trinity river to the beginning point, and thus the boundaries of the grant are fixed.

It follows, from the decree as modified, that the east boundary of the Viesca grant is 200 varas further west than fixed in the original judgment. The judgment for damages is accordingly modified, and an inspection of the record shows that there should be deducted the following amounts, to wit: 85.45 acres of the D. W. Smith, Jr., survey, having 6,000 feet to the acre, at a valuation of $3 per thousand; 102.16 acres of the Wm. White, having 10,000 feet to the acre, at $3 per thousand; 28.32 acres of the Wm. Hicks, having 10,000 feet to the acre, at $3 per thousand—aggregating $5,452.50. This amount should be deducted from the original award of $30,936, and the judgment is accordingly reformed for the sum of $25,483.50, with interest at 6 per cent. from December 5, 1911, the date of the filing of the original petition.

At the earnest insistence of appellees, who have filed a very able and exhaustive motion for rehearing, we have again gone over the record, but find nothing that has caused us in any way to change our views, otherwise than as above, as expressed in the opinion heretofore handed down in this case.

The judgment will be reformed, in accordance with the views above expressed, and the motion for rehearing is in all things overruled.